George Lee **STANSBURY**,

v.

**UNITED STATES of America.**

**No. 15066.**

United States Court of Appeals, Fifth Circuit.

Jan. 28, 1955.

---

Leonard Brown, San Antonio, Tex., for appellant.

Chas. F. Herring, U. S. Atty., Bradford F. Miller, Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before HOLMES and TUTTLE, Circuit Judges, and ALLRED, District Judge.

ALLRED, District Judge.

Appellant was convicted by a jury on three counts of an indictment charging

violation of, and conspiracy to violate, the Marihuana Tax Act, 26 U.S.C.A. §§ 2590, 2591(a) and 2593(a). The conspiracy count charged that appellant conspired with Royster, a co-defendant, who also was convicted on two other substantive counts. The evidence against appellant was weak and circumstantial, dependent almost entirely on the testimony of C. B. Russell, a military policeman, working as an undercover agent for federal narcotics officers. In its most favorable light (from the Government's standpoint), it is, copied from appellee's brief, as follows:

"The Government Agent, C. B. Russell, testified that he first saw Appellant in Mary's Bar where Appellant was seated at a table; that two men who were with Russell went over to Appellant and had a conversation, that these men returned to Russell and had a conversation with Russell, after which they returned to Appellant and had another conversation, and again returned to Russell, and then Russell and his two companions left the bar, and returned to the meeting place with the Narcotics Officers who were supervising their activities. Shortly the three returned to the bar, and all went over and sat down with Appellant at his table. Appellant then said to Russell: 'I can get the stuff down for you to see it if you want me to.' Russell replied: 'That's the only way I do business.' Appellant then instructed Russell to wait at a nearby barbecue stand, and informed Russell that 'When the stuff was ready he would send someone after us.' (R. 16) Russell followed Appellant's instructions, and after a while *th* co-defendant Royster came and told Russell to accompany him. Royster led Russell to the rear of Mary's Bar, where Royster pointed out the marihuana on the ground. Russell testified he paid Royster $100.00 at that time, and as he walked away Royster called to him it was $10.00 short. When Russell insisted it was $100.00, Royster called after him: 'What am I going to tell the man?'

"No one was arrested until more than a week later. After his arrest, Appellant appeared at the office of the Federal Bureau of Investigation and spoke to an agent he knew. This agent arranged for the Chief of the Narcotics Office to come to the Federal Bureau of Investigation office for a conference. At this meeting Appellant admitted he was present at Mary's Bar on the evening of the sale of marihuana and admitted he saw Russell and his companions there that evening. In this conference Appellant made no claim of alibi at all, but only denied his connection with the sale of marihuana. His main interest in the conference was to learn why one of the companions of Russell was not prosecuted."

■ Although no motion was made for verdict of acquittal, appellant alleges error in overruling his motion for new trial, based on insufficient evidence. The foregoing summary, while not presenting a very strong case, discloses, circumstantially, a conspiracy to acquire and transfer marihuana in which appellant participated with guilty knowledge; and a sale of such marihuana to which appellant was a principal. It is sufficient to support the verdict.

■ Appellant's chief complaint here is as to (1) alleged improper cross-examination of himself and his witness, Gloria White, as to his being the father of her illegitimate child; (2) questions as to his having taken out a federal wagering stamp and being engaged in a policy wheel; and (3) officer testimony as to statements made by appellant concerning these matters. Most of the questions were not objected to but belated objections were made and we think these collateral matters were of such a nature on the whole that the trial court, of his own motion, should have admonished the jury not to consider them; or should have limited the purpose for which some

of the evidence was admitted. This conclusion is based in part on the fact that, as pointed out, the case in chief was not at all strong and the prejudicial matters hereafter set out may well have tilted the scales against appellant on the question of his guilt or innocence of the offenses charged.

The full significance of some of the questions as to appellant's having three residences, whether he was living with his wife, whether she was present at the trial, etc., could hardly be appreciated until the Government recalled Gloria White for further cross-examination after appellant had rested. But that there was a design to insinuate (although it was never proved, even circumstantially), that appellant was the father of Gloria White's illegitimate child was disclosed at the very outset by the testimony of the Narcotic Agent, Hooper, who testified that appellant "was arrested by myself, Detective Hinojosa and Sergeant Guerrero, and en route to the police station, . . . Hinojosa asked him where he lived and the defendant said this; he said he lived three places that he stayed at. And Hinojosa then asked him if he stayed in all three of them much. He said, yes, that he did, that the police were always after him."[1]

Appellant's principal defense was an alibi—that he was playing cards socially at a private residence at the time of the alleged dealing with Russell. He testified briefly on direct examination that he was married, had three children and lived at 619 Blaine Street; that he had been an expert wigmaker since 1945; that he had sold a few cars and a little real estate; that he had a lease on the whole building where Mary's Bar was located; that there was a ten-room hotel upstairs and he had subleased the premises where the bar was operated. He then denied the testimony of Russell and testified as to his whereabouts on the occasion in question. Immediately on cross-examination he was asked his wife's name, when they were married, whether they still were married, and whether he had any other residences. Appellant answered that he sometimes stayed at his mother's home and his aunt's house. He was then asked: "Why do you spend the night at these other places?" * * * "You are not separated from your wife?" and whether he had told the policemen where he lived, and he had three residences; whether the officers asked him about his wife and family, how well he knew Gloria White, whether he told the officers how well he knew her and about his "relations" with her;[2] whether his wife was in the court

1. The court sustained an objection to the statement that "the police were always after him" and instructed the jury not to consider it.

2. The following is a sample:
   "Q. Do you remember anything else you could have told these police officers or these narcotic agents?
   A. They didn't ask me anything.
   Q. Did they ask you any questions about your wife and family?
   A. No, sir, they didn't. The narcotic agent didn't ask me nothing about my wife and family.
   Q. How well do you know Gloria White?
   A. I know her.
   Q. How well?
   A. I know her well.
   Q. All right. How well?
   A. I know her well. I wouldn't know anything else to say other than I know her well, sir.

   Q. Well, did you tell the police officers about how well you knew her?
   A. No, sir, I never told no police officers how well I knew her.
   Q. You haven't? You haven't told any police officers anything about any relations you have had with her?
   A. Not as I know of, I haven't. No police officers. And I wouldn't tell anyone any relations I have with any woman.
   Q. You say you haven't in this instance talked to Mr. Ligon and Mr. Bromley or anyone else in the narcotics or police staff about that matter?
   A. I don't understand.
   Q. I say you haven't talked to Ligon or Bromley or any other narcotic agents or police officers about that matter?
   A. Which matter?
   Q. Your relationship with Gloria White.
   A. I haven't talked to anybody about my personal relation with any woman, sir.

room or was there the day before; whether she had ever lived at the house where Lawrence Younger [3] lived; how old his children were, whether he had any other children than by his wife and whether he told the officers about any others.[4]

In rebuttal the Government was permitted to prove, over appellant's objections, that, after arrest, appellant told narcotics officer Ligon that he was not married, that he had a common law wife and a three months old son who had been staying at the home of Lawrence Younger's mother; and that Ligon had never heard appellant mention having a six year old and one year old child or having "a ceremonial wife." [5]

> Q. That's what I want to know. You say you haven't? I want to know before we go on to something else.
> A. (after a pause) Are you waiting for me, sir?
> Q. Yes. Are you sure?
> A. I don't understand, really, what you mean.
> Q. Have you ever discussed it with any police officers?
> A. Discussed what, sir?
> Q. Your relationship with Gloria White.
> A. I mean I don't understand 'relationship.'
> Q. The associations between you.
> A. No, sir, I haven't told any police officer nothing about no association with Gloria White."

3. An addict and government informer who went with Russell to purchase marihuana from Royster, the co-defendant.

4. The court sustained an objection as to whether appellant had told the officers about any others.

5. Appellant had not testified to, or been asked about, any ceremonial marriage. It is to be noted that even in this conversation appellant did not say that Gloria White was the woman with whom he had been living and by whom he had the child.

6. The record shows that Gloria was recalled "as a witness in rebuttal," but a supplemental record has been filed showing that she was recalled for the purpose stated above. The record shows, however, that she was the last witness used and that the following transpired:
"Mr. Miller (Assistant U. S. Attorney):

The Government then was permitted to recall defendant's witness, Gloria White, for further cross-examination, after the prosecution stated it was for the purpose of showing bias or prejudice on the part of the witness in favor of appellant, offering to prove that they had been living together and that appellant was the father of Gloria's child.[6] She reluctantly testified that she had lived at the place where Lawrence Younger lived, but it had been about two years before; that she had two children but refused to name their father; she was specifically asked if appellant was the father of her last child, which she denied.[7] So the Government fell down on its offer of proof.

"May I approach the bench, Your Honor?'
"The Court: 'Yes, sir.'
(Thereupon counsel conferred with the Court at the bench out of the hearing of the reporter).
"The Court: 'For the reasons stated, that will be overruled.'
"Mr. Brown: 'Note our exception.' "
While conferences outside the hearing of the jury are necessary and desirable, we doubt that they are proper unless reported. 28 U.S.C.A. § 753(b) (1) requires "all proceedings in criminal cases had in open court" to be recorded verbatim. Apparently this cannot be waived since there must be a specific agreement to waive reporting in other cases. The requirement that all open court proceedings in criminal cases be reported was designed to prevent disputes and questions of veracity all too common under the old system. We suggest to trial judges that the better practice would be to call the reporter to the bench to record these conferences between court and counsel. This will eliminate the necessity for supplemental records as to what occurs in open court, generally outside the defendant's hearing.

7. "Q. Are you married?
A. No, sir, I am not.
Q. Do you have any children?
A. I sure have.
Q. What say?
A. I have.
Q. What's the child's name?
A. I have two children.
Q. What are their names?
A. I really refuse to speak about my children.

■ The Government contends on brief that cross examination of appellant about his wife and children, his alleged three places of residence and his relations

Q. Well, who is the father of these children?

A. I refuse that too."

"Mr. Miller: Your Honor, we think that's material.

The Court (to witness): What did you say?

The Witness: My children, he wants to know the children's name.

The Court: Speak out loud.

The Witness: I said I refuse to speak of my children.

The Court: Repeat the first question you are asking.

Mr. Miller: I asked her what are the children's names, and then I asked—

The Court: Go ahead and answer the question. What are your children's names?

The Witness: One of my children's name is Richard White.

Q. (By Mr. Miller) Richard White?

A. Yes, sir.

Q. And what's the other name?

A. The other one's name is Audwin Dimas.

Q. Audwin what?

A. Dimas.

Q. How did you name him Dimas?

A. That's my name.

Q. Who is the father of that last child?

A. I refuse to answer.

The Court: Come up here.

(Thereupon counsel conferred with the Court at the bench out of the hearing of the reporter).

Q. (By Mr. Miller) What's the name of the father of the last child you mentioned?

A. I never did say.

Q. I know. I say what is it?

A. I refuse to answer that question because it might incriminate me.

Q. How could that incriminate you?

A. Very easily.

Q. What's that?

A. Very easily.

Q. Well, as a matter of fact, isn't George Stansberry the father of that child?

A. No, sir, he isn't.

Q. He is not? Why are you unwilling to say who the father is?

A. Because he isn't and—

Q. How old is the child?

A. He's about five months old.

Q. How old was he in October last?

A. In October?

Q. Yes.

A. He was about three or four months old.

Q. About three or four months old?

A. About three months old.

Q. Have you ever lived with George Stansberry?

A. No, sir, I sure haven't.

Q. If George Stansberry told the police officers that arrested him that he had lived with you and you were his common law wife and that you had a three-month old child that was his—

Mr. Brown: I object to that, may it please the Court.

Q. (By Mr. Miller)—would that be correct?

A. No.

Mr. Brown: I object to that—passing upon the credibility of the witnesses, saying whether George Stansberry was telling the truth—

The Court: I will sustain that objection. Disregard the last statement and last question.

Q. (By Mr. Miller) You are positive you were not making your home at Lawrence Younger's mother's house in September or October of 1953?

A. That's correct.

Q. You know the street address of that house?

A. I sure do.

Q. What is it?

A. 320 Toledo.

Q. And did you ever keep any clothes there in September and October 1953?

A. No, I wasn't.

Q. Did you spend the night there at any time during September and October 1953?

A. No.

Q. Did any of your children live there or spend the night there during September and October 1953?

A. No, they surely didn't.

Q. They did not?

A. No, sir.

Q. What is Lawrence Younger's mother's name?

A. Mrs. Powell.

Q. Mrs. what?

A. Powell.

Q. How do you spell that?

A. P-o-w-e-l-l.

Q. How do you spell the name of your youngest son?

A. D-i-m-a-s.

Q. His first name.

A. A-u-d-w-i-n.

Q. And neither you nor he made your home there or spent the night there in September and October 1953?

A. No, sir.

Q. You are sure?

A. That's right."

with Gloria White, was proper in view of his brief testimony as to his wife and three children and his place of residence. There was no actual proof as to the falsity of any of his statements. It was at best insinuation and inuendo of a highly prejudicial nature. It was immaterial whether appellant was married or single, whether he had children or not. The charge was that he had violated, and conspired to violate, the Marihuana Tax Act. The court properly could have sustained an objection to appellant's testimony or direct examination that he was married and had two children; but the Government made no such objection, choosing rather to cross examine him in the fashion set out above and then offer officer testimony in rebuttal to impeach him on these wholly irrelevant and prejudicial matters; and, by further "cross examination" of Gloria White to insinuate, without proof or circumstance, that he was the father of her illegitimate child. Even if this proof had been made, we think, under the circumstances, the court should have instructed the jury that appellant was not on trial for adultery or living with Gloria White; and that the further "cross examination" of Gloria White, or any evidence as to her alleged relationship with appellant could only be considered for the purpose of affecting her credibility. We think the cross examination of appellant and Gloria White as to his alleged relationship with her, as well as the "impeaching" testimony of Ligon, was improper and highly prejudicial.[8]

■ Appellant was subjected to another type of cross examination and impeachment with reference to the extraneous offenses of gambling and a policy wheel which went we think beyond due bounds and should have been stricken or properly limited. While, in view of his testimony as to being a wigmaker, it might have been proper to ask him about other business in which he was engaged at the time, yet the case should never have gone to the extent it did and the jury should have been told that he was not on trial for gambling or conducting a lottery but that the evidence had been permitted as bearing on his credibility. Appellant was asked whether he had told the officers or anyone that he had a federal wagering tax stamp. He answered that he had such a stamp, that it was not a secret, that it came out in the paper. The Government attorney was not satisfied with this but pressed on as to whether gambling was in fact his business, whether he had not filled out a tax return to get the stamp, whether he remembered the words on the application, "that it says on there that you are a person engaged in the business of accepting wagers * * * and you signed it under the penalties of perjury? * * * Don't you know that you have to be in that business before they will give you a stamp, and that you have to swear that you are before they will give you one?" He was then asked whether he had ever operated a policy wheel.[9] When appellant's counsel objected the Court said: "The testimony is in, Mr. Brown, without any objection." Defendant's counsel was derelict in this but we think the court should have acted when the objection was made; especially in view of the fact that

---

8. Cf. Packineau v. United States, 8 Cir., 202 F.2d 681, 687; Echert v. United States, 8 Cir., 188 F.2d 336, 343.

9. "Q. Did you ever operate a policy wheel?
A. Did I ever operate one?
Q. Yes.
A. Well, I worked in the lottery, yes, sir.
Q. Not a policy?
A. No, it's a lottery.
Q. When were you working in one?
A. Well, I have worked for lottery; I have worked in lottery. It hasn't been open very much here in San Antonio. Its people was supposed to open and then they put it off. It really hasn't ever opened. People have bought a lot of stamps. Real lottery hasn't ever opened.
Mr. Brown: The only way in the world they can impeach a witness in the federal court is by asking whether he has been convicted of felony. This business of asking his occupation and insinuating gambling—
The Court: The testimony is in, Mr. Brown, without any objection."

Government counsel, after going back into some of the family matters discussed above, shortly returned to the gambling field, inquiring whether appellant knew George Gilmore, nicknamed Truelove, whether he had *ever* been in a policy wheel with him, or had told anybody that he had been.[10] When he answered, "not as I remember," narcotic agent Bromley was permitted to testify that appellant had told him he was a gambler, that he was associated with George Gilmore, known as Truelove, in the lottery racket *at one time*.[11] The Court overruled appellant's objection notwithstanding he had indicated, when appellant was under cross examination, that an objection would have been sustained had it been made timely.

■■ We think appellant's objection that this was impeachment on a wholly immaterial matter should have been sustained. While a defendant is subject to cross examination like any other witness, the general rule is that evidence of other crimes unconnected with the one on trial is inadmissible.[12] There are exceptions to this rule but none are applicable here. There is no claim that the fact that appellant may have been a gambler, or helped operate a lottery wheel at one time, is in any way connected with the offense of selling marihuana; or that intent or system is involved. No convictions were shown or attempted to be shown. The situation is altogether different from Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 355, 98 L.Ed. 503, where the defendant, charged with a narcotics violation, testified on direct examination that he had never had narcotics in his possession and the Government was

---

10. "Q. Do you know George Gilmore?
A. Who is that?
Q. George Gilmore.
A. I know of him.
Q. Do you know his nickname?
A. Yes, sir, I do.
Q. What is it?
A. Truelove, I think.
Q. Truelove. Were you up at his house on the night of the 26th of September?
A. No.
Q. Do you know where his house is?
A. Where his house is?
Q. Yes.
A. I don't know where his house is now.
Q. Where was it then?
A. I don't know then where his house was. I think he sold his house, they told me.
Q. Have you ever been in the policy wheel with him?
A. A policy wheel with him?
Q. Yes.
A. No, sir.
Q. Did you ever tell anybody you had been?
A. Did I ever tell anybody I had been?
Q. Yes.
A. Not as I can remember. The only lottery I have ever been I wasn't in with George Gilmore. The only lottery I was ever in is on the record in the federal office now.
Q. Who have you been in with?
A. I have never been in with anybody. It's on the federal record, I have never been in with anybody, sir.

11. "Q. Mr. Bromley, did you have any conversation with Stansberry about his business or occupation?
A. Yes, sir, I did.
Q. What did he say it was?
A. He stated he was a gambler.
Mr. Brown: It's impeachment on a wholly immaterial matter.
Mr. Miller: It goes to credibility, Your Honor.
The Court: I will overrule that.
Mr. Brown: They are trying to——
The Court: In view of the answer, I will overrule the objection.
Mr. Brown: Note our exception.
Q. (By Mr. Miller) Did he say who he was associated with in that business?
A. Not in the gambling. He stated he was associated with George Gilmore in the lottery racket at one time.
Q. And George Gilmore is known as Truelove; is that right?
A. Yes, sir.
Q. Do you know George Gilmore's reputation?
Mr. Brown: We object to that.
The Court: That objection is sustained.
Q. (By Mr. Miller) All right. Did you have any conversation with this man Stansberry about his family, who they consisted of and who they were?
A. No, sir, not that I recall."

12. Weiss v. United States, 5 Cir., 122 F.2d 675, 682; Coleman v. United States, 5 Cir., 167 F.2d 837, 839.

permitted to show an illegal seizure two years before. Moreover, in that case the trial court "carefully charged the jury that it was not to be used to determine whether the defendant had committed the crimes here charged, but solely for the purpose of impeaching the defendant's credibility."

In this case where, as stated, the evidence as to guilt was not especially strong, we cannot say that the evidence and proceedings, either as to appellant's relationship with Gloria White or his alleged gambling activities, not limited in any way by instructions to the jury, was harmless error.

Reversed.