**UNITED STATES of America,**
**Appellee,**

v.

**Samuel G. BENO, Defendant-Appellant.**

**No. 44, Docket 28226.**

United States Court of Appeals
Second Circuit.

Argued Oct. 8, 1963.

Decided Nov. 12, 1963.

Robert C. Zampano, U. S. Atty., District of Connecticut, New Haven, Conn., for appellee.

W. Paul Flynn, of Kopkind & Flynn, New Haven, Conn., for defendant-appellant.

Before CLARK, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

Samuel G. Beno, an Internal Revenue Agent, was convicted by a jury of soliciting and receiving a set of the Encyclopaedia Britannica and a dictionary from a taxpayer, intending that they in-

fluence his official decisions in violation of federal law, 18 U.S.C. § 202. On appeal, Beno contends that the prosecution was improperly permitted to educe on cross-examination highly prejudicial evidence concerning specific acts of the defendant which were wholly unrelated to the offense charged, and was further allowed to introduce extensive independent damaging testimony with reference to these collateral acts through three government "character" witnesses.

The government's case against Beno may be briefly summarized. The evidence revealed that at the time of the alleged offense, Beno was attached to the Stamford, Connecticut office of the Internal Revenue Service, and that in September of 1961, he was assigned the income tax return of the Walden Book Company for examination. It further appeared that in examining the return, Beno noticed the name of Charles Guinta listed as Walden's Treasurer. Since he had previously known an accountant by the name of Richard Guinta, Beno telephoned Richard, told him that he was in the process of examining Walden's return, and asked him whether he was related to Charles. When he was informed that the two were brothers, Beno allegedly told Richard that he was interested in acquiring a set of the Encyclopaedia Britannica, and, according to the government, gave Richard "the definite impression that if he received the books, Beno would render services beneficial to the company in the event of an audit." Richard subsequently informed Charles about his conversation with Beno, and Charles promptly forwarded this information to the Inspection Division of the Internal Revenue Service in Boston. Within a short period, Beno called Charles directly to ask about the books, allegedly assuring him that he would "survey" Walden's return, an esoteric Internal Revenue term defined at trial to mean returning it to the home office without any examination of the taxpayer's books and records. During this conversation, moreover, arrangements were made for Beno to pick up the volumes

of the encyclopedia on October 2nd, in Charles' office.

With the cooperation of Charles and without the knowledge of Beno, the Inspection Division had arranged to mechanically record this October 2nd meeting upon a tape which was ultimately played for the jury. During the course of this recorded interview, Beno did mention that he intended to "survey" Walden's return, but, despite some prodding from Charles, he did not furnish the prosecution with plainly incriminating admissions of any real value. In any event, after his discussion with Charles, Beno collected the encyclopedia and a dictionary and departed, but before he could reach his automobile, he was intercepted by government agents and arrested. This, in brief, was the prosecution's case.

Faced with the tape and arrested while in possession of the books, Beno, by way of defense, did not seriously dispute the fact that he had called Richard Guinta, that he had spoken to Charles, or that he had received the encyclopedia and the dictionary, and, instead, maintained that he had always intended to pay for the books. In support of this contention, he introduced several witnesses who testified that he had requested a loan about the time of the events in question for the express purpose of purchasing a set of encyclopedia. Insisting that his conduct and motives were pure, Beno further suggested that he had been interested in obtaining the encyclopedia so that he might donate it to a community library, upon whose behalf the defendant's sister-in-law was apparently an active fundraiser.

Thus we are met by the opposing positions of the government and the defendant: the government painting Beno as a man of easy scruples, more alert to the prospect of a profitable hand-out than the call of his official obligations, and Beno, picturing himself as the innocent victim of some overzealous police work. Beno now complains, however, that the portrait of an unscrupulous official was painted by the prosecution with such

broad brush-strokes and in such vivid detail that serious prejudice was inevitable. In essence, he argues that the prosecution was not content to portray the actions which have already been recounted and which immediately preceded his arrest, but instead insisted upon describing specific occurrences which possessed no relevance to the charge of bribery other than to indicate that Beno was, indeed, an obnoxious individual.

To deal adequately with Beno's objections, we are compelled to outline the course of the trial in some detail. We note, at the outset, that the presentation by the government of the improper, distracting and extraneous side-issues of which Beno now complains was in some degree invited by the defense.

■ After the government concluded its case in chief, the propriety of which is not challenged on appeal, the defense opened by calling witnesses Candee, McCracken and Nagle to testify in Beno's behalf. It soon appeared that there was some uncertainty as to the role which these witnesses were to play. While the defense insisted that their testimony would be relevant on the issue of Beno's "intent," or "predisposition" to commit the offense charged, the Court instead admitted their evidence, over strenuous government objections, as going to the question of the defendant's "character."[1] Each witness thereupon told of specific meetings with the defendant in the course of Beno's official duties, in connection with the audits of other income tax returns in which the various witnesses had been interested. All, while noting Beno's courteous and trustworthy appearance, admitted that they knew him only through these professional encoun-

ters, and that their meetings had been brief and sporadic.[2] On cross-examination, it became clear that none of the three was competent to testify as to Beno's community reputation for honesty, veracity, trustworthiness or any other trait commonly classified as relevant to character.

In a colloquy with counsel held out of the jury's presence and immediately after Candee, McCracken and Nagle had been excused, the trial judge confessed that he had been somewhat surprised by the general gist of their testimony. Citing Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the Court correctly observed that character witnesses may only testify as to general community reputation, and may not describe specific acts of the defendant, or divulge their personal observations or opinions; under such a test, the judge pointed out, the testimony of Candee, McCracken and Nagle was clearly improper.

Immediately after this discussion, the defense voluntarily excused two additional witnesses who had planned to testify along the same lines as had Candee, McCracken and Nagle. The court, however, did not strike the testimony of the three already called because of the position taken by the prosecution. For having failed in his earlier attempt to prevent the defense from introducing evidence of specific collateral acts, the prosecuting attorney now indicated that he was willing to wage the contest on the defendant's own terms. Thus, in response to a question of the Court, the prosecutor explained that he would "make no motion to strike at this point." Now "that the door [was] open," he add-

---

1. The colloquy at this point was instructive. After the government objected to the line of questioning pursued with the witness Candee, defense counsel W. Paul Flynn explained his purpose in calling the witness.

"The Court: Well, I am sure that it is character testimony, is it not?

"Mr. Flynn: Well, the texts don't call it that, your Honor. The texts do not

call it character testimony, they indicate that it's relevant on issues of intent. Disposition to commit the crime.

"The Court: Well, that's precisely what interpretation of character and reputation is.

"I will allow it."

2. In the case of the witness Nagle, contacts with Beno totalled two hours.

ed, "I would rather go through it * * * myself than have it closed." And the prosecution was to do precisely that.

After three witnesses had testified in support of the defendant's contention that he intended to pay for the encyclopedia, Beno himself took the stand. In response to questioning on his direct examination, he briefly outlined his educational background, his military history and his employment record, placing particular emphasis upon the importance of his duties with the Internal Revenue Service. Once again asserting his innocence, Beno concluded his direct testimony by concisely denying that he had ever considered the encyclopedia or dictionary as a gratuity which was intended to influence the performance of his official duties.

On cross-examination, the prosecution laid the groundwork for much that was to follow. First, in a long series of questions, Beno was asked whether he had ever accepted compensation for preparing the income tax returns of a Leo Chagnon during the period in which he [Beno] was employed by the Internal Revenue Service, in violation of the Rules of the Service. Although admitting that he had prepared Chagnon's returns, Beno resolutely denied the receipt of compensation. After the Chagnon returns were marked for identification as exhibits, Beno was asked whether he had perjuriously signed the names of various of his acquaintances as "preparers" of Chagnon's returns, and whether one of these acquaintances had warned him not to "fool around" preparing private returns. Beno reluctantly confessed to the false signatures, but denied the admonition.

The prosecution then moved to a speeding conviction which the defendant had incurred in Connecticut. Through Beno's answers, the jury learned both that he was somewhat careless behind the wheel, and that he had submitted travel vouchers to the government and was reimbursed for automobile expenses for the period during which his driver's license had been suspended as a result of this conviction. When, in response to the next series of questions, Beno admitted a Massachusetts arrest for reckless driving, he denied repeatedly that he had threatened to investigate or "pull the records" of several members of the police force.

The cross-examination was concluded with a series of questions about a trip to California which the defendant had taken with a lady friend a year prior to his involvement with the Walden Book Company. As a result of this line of testimony, the jury was left with the suggestion that there was something illicit about the California excursion, *and* that Beno had lied to his superiors in stating his reasons for requesting a leave of absence to make the journey. With this, Beno stepped down, having been subjected to exhaustive examination on five collateral issues: the receipt of compensation from Chagnon, the false signatures on the returns, the fraudulent submission of travel vouchers to the government, the alleged threats to the Massachusetts police officers, and the California trip, as well as having had his Connecticut and Massachusetts traffic convictions thoroughly aired.

Beno was followed to the stand by a parade of five defense character witnesses, the testimony of all of whom followed a fixed pattern. This time, each was first qualified to speak as to the defendant's community reputation for honesty and truthfulness, and then each swore that it was "excellent" or "very good"; on cross-examination, each was asked in rapid-fire succession whether he had "heard" that the defendant had received compensation for preparing income tax returns while in the employ of the Internal Revenue Service, that the defendant had been arrested in Massachusetts for driving under the influence of alcohol, that the defendant had been arrested in Massachusetts for reckless driving, and that, upon his latter arrest, the defendant had threatened to "pull the [tax] records" of the arresting officers. As each question was asked, the defense would object; all objections were

promptly overruled, and each witness would respond in the negative as to his knowledge of each "rumor."

Unwilling to rely upon its cross-examination of the defendant and his character witnesses, the prosecution, indicating its belief, which we have no reason to doubt was in good faith, that the door had been opened wide, proceeded to call its own witnesses, allegedly in "rebuttal" to the earlier defense testimony on the defendant's "intent" or "pre-disposition" to commit the offense.

The first "rebuttal" witness to take the stand was Jean Marie McCaffrey, formerly the lady friend of the defendant and one of the "acquaintances" whose name Beno had signed as "preparer" of the Chagnon returns. Over vigorous defense objections, Mrs. McCaffrey was permitted to testify that she did not sign the returns personally, and that she did not "remember" either preparing a tax return with Beno, or ever authorizing Beno to sign her name. After a cross-examination devoted to emphasizing that Mrs. McCaffrey's recollections were unclear, she was permitted to step down, and Leo Chagnon himself was called.

In the course of an examination which was ultimately to spread over 112 pages in the stenographic transcript, the overwhelming portion of which was devoted to Chagnon's examination by the government, Chagnon was questioned in detail as to his contacts with Beno, and particularly as to whether Beno had in fact accepted compensation for preparing his returns. When Chagnon continually refused to admit having paid Beno while the latter was employed by the government, the prosecution was permitted to treat this witness to a collateral matter as hostile and to show Chagnon an allegedly inconsistent written statement which he had given to government agents

before the trial. Ordered by the court to answer unequivocally the questions placed by the prosecution, Chagnon was then compelled to recount the circumstances which led to this prior statement, and to admit that he had lied under oath in assuring the government earlier that he had indeed compensated Beno for preparing the returns.[3]

After a lengthy series of questions revealed that Chagnon had informed the prosecuting attorney immediately before testifying that he intended to retract his earlier statement when placed on the stand, Chagnon was finally excused, and the prosecution concluded its presentation of "rebuttal" evidence by calling John B. McCausland, a police officer who had participated in Beno's arrest for reckless driving in Massachusetts. Once again, the question whether Beno had threatened to "pull the records" of the arresting officers was explored, and McCausland recounted, over the objections of the defense, the truculence and profanity which the defendant had displayed in making the alleged threats.

After both sides had rested and the case was ready for submission to the jury, Chagnon, through his own attorney, requested permission to reopen his testimony and to resume the stand. The court permitted this but first instructed the jury that Chagnon's testimony was "character" evidence and was not relevant to the central issue to be tried— the commission of the offense charged— but could merely be considered with reference to the question of reasonable doubt. Chagnon then proceeded to testify that he may have compensated Beno after all. After "the trial within a trial" had concluded, the case was finally closed and given to the jury to determine if Beno had solicited and received the encyclopedia and dictionary in violation of 18 U.S.C. § 202.

---

3. It is unnecessary to consider whether the prosecution was erroneously permitted to treat Chagnon as a hostile witness. We do note, however, that the atmosphere created when he was declared to be hostile added immeasurably to the impact of his appearance on the stand, and further decreased the likelihood that the jury's verdict would be determined by the evidence relating to the bribery offense charged.

From the foregoing, necessarily abbreviated account of the trial, it seems amply clear that an inordinate amount of incompetent evidence found its way into the record, and hence into the minds of the jurors. At best, some of this evidence was merely irrelevant; at worst, much of it was highly inflammatory and prejudicial. The voluminous testimony on specific, collateral acts of the defendant offered by "rebuttal" witnesses McCaffrey, McCausland, and especially Chagnon [just as the evidence offered by defense witnesses Candee, McCracken and Nagle] was, without doubt, incompetent as character testimony. As the trial judge himself recognized, only hearsay or reputation testimony is permissible on the question of the defendant's character. See 1 Wigmore § 193 at p. 643; McCormick on Evidence, § 158, at pp. 334, 337.

In Michelson v. United States, 335 U. S. 469, 69 S.Ct. 213 (1948), Mr. Justice Jackson spoke harsh words for character evidence in general: "To thus digress from evidence as to the offense to hear a contest as to the standing of the accused, at its best opens a tricky line of inquiry as to a shapeless and elusive subject matter. At its worst it opens a veritable Pandora's box of irresponsible gossip, innuendo and smear." He reasoned, however, that reputation evidence, even though it be hearsay, is preferable to evidence of the defendant's specific acts, because it avoids "innumerable collateral issues which, if it were attempted to prove character by direct testimony, would complicate and confuse the trial, distract the minds of jurymen and befog the chief issues in the litigation." In the present case, merely to cite a few of several infractions, we are driven to the conclusion that the exhaustive consideration devoted to whether Beno had been compensated by Chagnon, or whether Beno had threatened the officers who arrested him for reckless driving did far more than to distract or befog the jury. By attempting to show that Beno was the sort of man likely to be the perpetrator of crime, the prosecution denied him a fair opportunity to defend against the particular crime charged, for this sort of evidence weighs too heavily with the jury and makes impossible the dispassionate approach necessary if justice is to be achieved.

The introduction of these side issues may not be justified as bearing on Beno's intent, since the conduct involved is not of sufficient similarity to that alleged in the indictment to be admissible. Compare United States v. Schiller, 187 F.2d 572 (2d Cir. 1951). This requirement that past crimes be of a similar nature before they are admissible on the issue of intent gives effect to one of the most fundamental notions known to our law—that a man is entitled to be tried only for specific charges explicitly stated, and should not be compelled to defend a lifetime of conduct. See McCormick on Evidence, 1954, § 157. It may be argued that Beno's alleged receipt of compensation for the preparation of Chagnon's tax returns might violate the regulations of the Internal Revenue Service, as well as the statutes. See I.R.C.1954 § 7214(a) (2); 18 U.S.C. § 209. But see, 2 U.S.Code Cong. & Ad. News p. 3863, 87th Cong. 2nd Sess. But it is not necessary for us to determine this. For, in this case, we feel that even if there have been these infractions, the acceptance of compensation for outside employment unrelated to Beno's official capacity is sufficiently distinguishable from the taking of a bribe to influence the performance of his official conduct so as to make the evidence inadmissible.

Nor do we see any merit to the prosecution's contention that all of these side-issues were relevant to the defendant's claim of entrapment. In the first place, there was no evidence of entrapment. The defendant did not assert that the government had unlawfully induced him to commit an offense, but, instead, that he had not committed one. Further, the jury was explicitly instructed that the testimony of witnesses Chagnon, McCaffrey and McCausland was relevant solely on the question of the defendant's

character. Finally, while the still-prevailing view of entrapment does make the defendant's "pre-disposition to commit the offense" a relevant consideration, see Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 848 (1958), this has never, so far as we have been able to determine, been interpreted to permit the sweeping freewheeling and devastating sort of inquiry allowed here.

■■ We are left then to determine whether the defendant, by calling witnesses Candee, McCracken and Nagle to testify as to specific occasions on which Beno acted honorably, thereby "opened the door" to all of the testimony offered, both on cross-examination and through the prosecution's rebuttal witnesses, as to the specific instances on which his conduct was improper in one fashion or another.[4] In determining this issue, we must first distinguish two different situations from the present case. It is true, as the government has noted that where a defendant, in his direct testimony, falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied *as to that fact*. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L. Ed. 503 (1954); United States v. Colletti, 245 F.2d 781 (2nd Cir.), cert. denied Russo v. U. S., 355 U.S. 874, 78 S.Ct. 125, 2 L.Ed.2d 78 (1957). The rationale behind this rule is not difficult to perceive, for even if the issue injected is irrelevant or collateral, a defendant should not be allowed to profit by a gratuitously offered misstatement.

■ Further, where a defendant has offered *proper* character testimony through witnesses who testify to his good reputation in the community, it is permissible to ask these witnesses whether they have "heard" of rumors which could injuriously affect their evaluation, provided that the prosecution acts in the good faith belief that the incidents to which the questions allude actually occurred, and the jury is instructed as to the limited weight which such "evidence" may be given. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948); United States v. Giddins, 273 F.2d 843 (2d Cir.), cert. denied, 362 U.S. 971, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); United States v. Conforti, 200 F.2d 365 (7th Cir.), cert. denied, 345 U. S. 925, 73 S.Ct. 782, 97 L.Ed. 1356 (1953). The often-stated purpose for permitting such questions, even when they refer to a defendant's prior arrests, is that they better enable the jury to evaluate the character testimony which has been proffered. If a witness has heard of these damaging "rumors" and adheres to his statement that the defendant's reputation is good, some light will have been shed upon the standards which he has employed; alternatively, if he has not heard of these "rumors," some doubt will have been cast upon his ability to speak on behalf of the community.

But neither of these rules suggests that once a defendant has offered irrelevant and incompetent evidence on certain specific facts, the prosecution is immediately entitled to explore without restraint and at great length *any* specific occurrence which might tend to create an abhorrent image of the defendant. See Stansbury v. United States, 219 F.2d 165 (5th Cir. 1955); United States v. Provoo, 215 F.2d 531 (2d Cir. 1954). For it makes little sense to insist that once incompetent evidence is erroneously admitted, the error must of necessity be compounded by "opening the door" so wide that rebutting collateral, inflammatory and highly prejudicial evidence may enter the minds of the jurors. In short, a small advantage improperly obtained does not compel the exaction of a gross disadvantage in penalty, particularly

---

4. We do not find it necessary to determine whether the cross-examination of Beno, standing alone, was so improper as to compel reversal. In the present case, the seeds sown on cross-examination were reaped in the testimony of the prosecution's rebuttal witnesses, and the damage done to the defendant infinitely compounded.

where a tarnished verdict is the inevitable result.

As we have already indicated, a criminal defendant is entitled to have his guilt or innocence determined on the specific offense charged and not risk the possibility of conviction for a series of prior specific acts which collectively suggested that his career had been reprehensible. The force of this principle, which lies at the heart of our criminal law system and seems a vital part of our definition of due process of law, is in no way blunted merely because a defendant has, in seeking acquittal, introduced evidence of less than questionable relevance. While there are instances in which a defendant may waive rights which the law invokes for his protection, Walder v. United States, supra, the right to be tried for a specific offense, as the very foundation of a criminal trial as we know it, cannot be one of them.

In terms of probable impact upon the minds of the jury, moreover, the evidence of collateral acts introduced by prosecution and defense can in no respect be said to be equivalent. Thus, in the present case, a jury which had learned that Beno violated Internal Revenue Service directives by accepting compensation for the preparation of private tax returns, unlawfully signed the names of others as "preparers" of these returns, and attempted to abuse his official authority in threatening police officers who arrested him for reckless driving is unlikely to be impressed by the irrelevant evidence that he acted properly in the cases of three individual tax audits. To put it succinctly, once a man—and especially an Internal Revenue Agent—has been shown to be fundamentally immoral, a jury will hardly be influenced by the fact that there *were* days when he did *not* do anything dishonest.

We might add, finally, that the calling of prosecution "rebuttal" witnesses and the cross-examination to which Beno was subjected were as unnecessary as they were potentially prejudicial. By demonstrating, in cross-examination, that defense witnesses Candee, McCracken and Nagle were unqualified to testify as to Beno's community reputation and could only assert that they had never *seen* him do anything wrong, the prosecution was able to destroy whatever effect they did have on the jury; this could have been ensured by a motion to strike their testimony which, as we have mentioned, the District Judge indicated a willingness to grant.

Looking at the record as a whole, we are unable to determine whether Beno was convicted of unlawfully accepting a gratuity, or of accepting compensation from Chagnon, threatening the police officers, or any other of his prior activities which were thoroughly explored for the jury's edification. We thus feel constrained to reverse the conviction.[5]

The judgment of conviction will be reversed, and the case remanded for a new trial.

---

5. Upon submitting the case to the jury, the Court did charge that the testimony of defense witnesses Candee, McCracken and Nagle, as well as that of prosecution witnesses McCaffrey, McCausland and Chagnon, was not to be considered with reference to the defendant's guilt or innocence of the offense charged, but was merely "character" evidence relevant to the question of reasonable doubt. In view of our conclusion that this evidence was improper and inadmissible, the charge was "too little, too late." But even if the jury had been properly instructed to disregard the prosecution's rebuttal testimony entirely, we feel that, under the circumstances of this case, this would have been insufficient to eradicate from the jurors' minds the prejudicial impact of this inflammatory testimony.