Charles N. LLOYD, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 7714.

District of Columbia Court of Appeals.

Argued Sept. 20, 1974.

Decided Feb. 26, 1975.

Dovey J. Roundtree, Washington, D. C., appointed by the court, for appellant.

Steven R. Schaars, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before KELLY, YEAGLEY and HARRIS, Associate Judges.

KELLY, Associate Judge:

Appellant was indicted on one count of second-degree murder (D.C.Code 1973, § 22–2403). He was convicted of the lesser included offense of manslaughter and sentenced to four to twelve years in prison.

About 2:00 p. m., on October 17, 1972, appellant and Melvin Tate, the deceased, were drinking together in an unlicensed establishment (an apartment). The two men

became so involved in a heated argument, apparently over the fact that Tate had refused to be a character witness for appellant in a prosecution for rape, that the lessee of the premises, Mr. Smith, asked them to leave. Appellant left the building but continued to drink and to make a commotion in the yard outside. After about half an hour, Tate went out to speak with him. There was testimony at trial that appellant pulled a knife on Tate and backed him over some boards that were lying about in the yard. The appellant, in pursuit, fell over Tate and cut his face on the boards. At that moment Smith and another man ran out of the apartment house, picked up some loose boards, and told appellant to get off Tate and not to hurt him. Appellant then left, his face bleeding, and walked down 14th Street, N.W. where he tried to hail a cab. Shortly thereafter Tate also left the yard and walked down 14th Street. He stopped to talk to a friend at 14th and U Streets, N.W., where appellant passed them and proceeded to the northeast corner of the intersection. The last eyewitness testimony was that Tate crossed to the southwest corner of the intersection. He later appeared, with two knife wounds in his abdomen, at the house of a friend to whom he stated, "I had a fight with Chuck [Mr. Lloyd] and he cut me." Meanwhile appellant had been picked up by the police at the southwest corner of 14th and U Streets, N. W., and transported to the hospital. It so happened that the two men were present in the anteroom at Freedmen's Hospital at the same time and Tate identified appellant to a police officer as the person who had stabbed him. Tate's abdominal wound became infected and he died of peritonitis ten days after being admitted to the hospital.

The contentions on appeal are (1) that it was error to deny appellant's motion for mistrial after the prosecutor introduced hearsay evidence of a rape to rebut appellant's evidence of good character, supposedly then in issue, and (2) that appellant was denied a fair trial because of the prosecutor's improper closing and rebuttal arguments to the jury.

For reasons which are unclear, defense counsel agreed that she had put appellant's character in issue by the following cross-examination of a government witness:

[Defense counsel]: You don't know anything that would indicate that Mr. Lloyd was a violent man, do you?

\* \* \* \* \* \*

That he was a person who would fight somebody, be aggressive?

\* \* \* \* \* \*

[Government witness]: From my understanding, he has been quite aggressive in this particular case we're speaking of.

Q. Not this case, but otherwise you don't know of any time or occasion where this man has gotten involved in a fight by starting a fight with somebody with a knife or otherwise, do you?

A. No, I don't know. I can't put my finger on it.

The prosecutor was then permitted to ask the witness on redirect whether he had heard that appellant was alleged to have raped a particular woman; that he had been acquitted on another rape charge; that he was arrested in November of 1971 for carrying a dangerous weapon—a knife; and that he had other arrests, one for carrying a gun, one for disorderly conduct, and one for drunkenness. Defense counsel informed the court at the bench that she did not object to these questions, and she in fact examined one witness about the alleged rape.

If character was in issue, it is clear that the prosecutor's questions pertaining to specific incidents of misconduct were proper. "[A] witness who testifies to the good reputation of a defendant may be asked on cross examination if he has heard of certain arrests or convictions of the defendant . . . ." United States v. Wooden, 137 U.S.App.D.C. 1, 2, 420 F.2d 251, 252

(1969). And "where a defendant has offered *proper* character testimony through witnesses who testify to his good reputation in the community, it is permissible to ask these witnesses whether they have 'heard' of rumors which could injuriously affect their evaluation . . . ." United States v. Beno, 324 F.2d 582, 588 (2d Cir. 1963). [Emphasis in original.] [1]

In this case, however, the prosecutor also called a final witness, the husband of the victim of the alleged rape, and asked why the witness would not, when asked, be a character witness for appellant. The witness replied: "Because he raped my wife." When defense counsel objected and moved for a mistrial, the trial judge, while noting that the alleged rape was already in evidence, nevertheless stopped the line of questioning and instructed the jury to disregard the testimony as to the rape. The mistrial motion was denied.

 Questioning a witness called in rebuttal on the issue of character as to specific incidents of misconduct is improper. The accepted practice is to elicit from a character witness only evidence as to what the witness has heard of the defendant's reputation in the community. "[C]haracter witnesses may only testify as to general community reputation, and may not describe specific acts of the defendant, or divulge their personal observations or opinions . . . ." United States v. Beno, *supra*, 324 F.2d at 584. In the *Beno* case, testimony of prosecution witnesses offered as character evidence in rebuttal to character witnesses called by the defendant was held to be incompetent because it dealt with specific, collateral acts of the defendant. The testimony of the witness-husband was equally incompetent here.

 The issue remains, however, whether this testimony was so prejudicial as to necessitate a mistrial, *i. e.,* whether the testimony that appellant had raped the wit-

ness' wife unduly affected the jury and the verdict it rendered. In pursuing this inquiry we take note of the fact that the trial judge immediately instructed the jury to disregard the testimony as it was improperly elicited from the witness. In addition, at the close of the government's case the court cautioned the jury as to the weight to be accorded the character evidence that was being introduced. Finally, as noted above, testimony as to this particular incident was already before the jury, adduced both by the prosecutor and by defense counsel in the examination of another government witness. Under these circumstances, we conclude that appellant was not unduly prejudiced by the objectionable testimony and find no abuse of discretion in the denial of appellant's motion for a mistrial.

The second major contention on appeal relates to the closing and rebuttal arguments of the prosecutor. Appellant complains that the following remarks were prejudicial and inflammatory in general and that some were improper on other grounds, *viz.,* (1) a reference by the prosecutor to buying bootleg liquor for his grandfather, apparently made to show a tolerant attitude towards those persons testifying at the trial who frequented a bootleg liquor establishment; (2) a reference to a horse race between Secretariat and Sham; (3) a reference to appellant's acquittal on a rape charge; (4) a reference to a statement of the decedent that "Chuck [Mr. Lloyd] cut me"; (5) speculation that the decedent was killed by a method known as "stealing a life", and (6) a reference to the deceased's death as a scar on a tombstone.

 The two remarks concerning the purchase of bootleg liquor and the horse race were not objected to at trial; however, even without objection, it is within the discretion of the appellate court to notice aberrations at trial which rise to the

1. *And see* Michelson v. United States, 335 U.S. 469, 483–84, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ; Stewart v. United States, 70 App. D.C. 101, 104 F.2d 234 (1939) ; McCormick on Evidence § 191 (2d ed. 1972).

level of "plain error" affecting substantial rights.[2] In exercising its discretion, the appellate court looks to all the circumstances of the case to determine whether there is a probability that there has been a miscarriage of justice. Adams v. United States, D.C.App., 302 A.2d 232, 234 (1973). But here, viewing the evidence as a whole we cannot say that allowing the prosecutor's remarks in question to stand unmodified before the jury amounted to error, let alone plain error.

■ The next two remarks—references to appellant's acquittal on a rape charge and to decedent's statement that appellant "cut" him—were comments on matters that were properly in evidence. Defense counsel had herself elicited the testimony "he cut me" in cross-examination of the investigating officer, and made no objection to further testimony on this point when it was again brought out by the prosecution. And, as stated earlier, appellant's acquittal on the rape charge was properly before the jury through the testimony of a government witness to which no objection was made.

This ostensibly leaves the prosecutor's last two references in closing argument to support the charge that the prosecutor's remarks were inflammatory and meant to appeal to the passion and prejudice of the jury. These were the references to a scar on a tombstone and to the prosecution theory that Tate, the decedent, was killed when appellant "stole" his life.[3]

The content of the concept of prejudice set forth in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) is:

. . . what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. . . .

\* \* \* \* \* \*

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. [Citation omitted.] But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. [*Id.* at 764–65, 66 S.Ct. at 1248.] [4]

---

2. "Of course appellate courts 'in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings' . . ." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940).

3. [Prosecutor]: [Defense counsel] will tell you and she would want you to remember that scar on this man's face.

You want to see a scar? You go to some grave somewhere, more than likely there's a headstone and on it is chiseled the name Melvin Tate. Now, there's a scar.

You can go out there to that grave wherever he is and—

\* \* \* \* \*

So, let's balance the scars, the fatal wounds against his [defendant's] falling on the nail.

See which one you think has the most impact on your minds, ladies and gentlemen. [R. at 436, 437.]

[Prosecutor]: When Officer Robinson stopped him in the cruiser, Charles Lloyd had his shirt back on, and was on the corner where Tate had been in good health.

Al Franklin said to steel [*sic*] a life means you take your coat or your shirt and you put it over your hand and you put the knife under there, and you come up and you gut the man. You steal his life, because you do it so quickly the man doesn't know what happened. [R. at 421.]

4. The mandate of *Kotteakos*, to consider the error "not singled out and standing alone, but in relation to all else that happened", *supra*, 328 U.S. at 764, 66 S.Ct. at 1248, to discover prejudice, has the effect to some extent of reinjecting issues into the case that have been dismissed on other grounds as, for

A prosecutor's closing and rebuttal arguments have been held to be prejudicial under differing sets of circumstances. In Viereck v. United States, 318 U.S. 236, 247, 63 S.Ct. 561, 87 L.Ed. 734 (1943), the lengthy closing remarks of the prosecutor in a trial of a German propagandist to the effect that this was war and the American people were relying on the jury for protection from the enemy were found by the Supreme Court to be prejudicial. In United States v. Hawkins, 156 U.S.App.D.C. 259, 480 F.2d 1151 (1973), the naming of known convicted murderers, the comparison of this murder case to another, and additional comparisons of the defendant to Napoleon and Hitler were found to be prejudicial, the court stating, 156 U.S.App.D.C. at 262, 480 F.2d at 1154: "When a defendant's sole defense is insanity, a prosecutor cannot be permitted to compare that defense to other infamous crimes where that defense has been raised and rejected." In United States v. Phillips, 155 U.S.App.D.C. 93, 476 F.2d 538 (1973), analogies drawn by the prosecutor between the crime of second-degree murder charged against the defendant and the crimes perpetrated by Sirhan Sirhan, Jack Ruby, and James Earl Ray were held to be so prejudicial as to require reversal, and in Brown v. United States, 125 U.S.App.D.C. 220, 370 F.2d 242 (1966), an argument that to acquit the defendant, a young black, in this confrontation between him and a police officer would leave the police powerless to protect people against such behavior and would necessitate the institution of martial law was held to be prejudicial.

In all of the above illustrations, the remarks found to be prejudicial dealt with matters "wholly irrelevant to any facts or issues in the case", the only purpose of which would be to arouse the passion and prejudice of the jury, Viereck v. United States, *supra,* 318 U.S. at 247, 63 S.Ct. at 566, and thus to improperly influence the verdict. Here, however, the remarks complained of cannot be simply identified as "extraneous", or characterized as dehors the record, and thus cannot be easily categorized as prejudicial.[5] What, then, was the effect of the references to stealing the life and a scar on the tombstone on the final judgment in the light of the entire case?

■■ The government called a number of eyewitnesses to the argument and fight that preceded the stabbing, one of whom saw the appellant near the scene of the killing with his shirt wrapped around his hand. It was later brought out that one purpose for wrapping the shirt in this manner might have been to conceal a knife and that this was common in the area where the stabbing occurred. It was also established that appellant was at the same intersection where the decedent was standing at about the time he was stabbed, although there was conflicting testimony as to whether appellant ever crossed the street and stood on the same corner as the decedent. Thus the circumstantial evidence against appellant was considerable and, that being so, the prosecutor's reference to "stealing a life" was in no way crucial to the jury's determination of guilt. And while the analogy of the murder to a scar on a tombstone was rhetorical and no doubt intended as an emotional appeal to the jury, the prosecutor was interrupted immediately and his remarks in this instance were inconsequential. In sum, however ill-considered the prosecutor's statements may have been, no prejudice fatal to

instance, the closing remarks in the instant case to which no objection was made.

5. Not every reference by a prosecutor in his remarks to matters outside the record will be held to be prejudicial. In Turner v. United States, 135 U.S.App.D.C. 59, 62, 416 F.2d 815, 818 (1969), references to a book about a murder and to a famous criminal were found, in effect, to be harmless as the court could not conclude that the conviction turned in any significant degree upon the government's closing argument.

appellant's conviction resulted from his closing and rebuttal arguments. Accordingly, the judgment of conviction on appeal is

Affirmed.