**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**James Adrian AMBROSE, alias Lilly
Ambrose, Defendant-Appellant.**

**Nos. 72-2190, 72-2191.**

United States Court of Appeals,
Sixth Circuit.

Argued April 18, 1973.

Decided Aug. 28, 1973.

Bob McD. Green, Johnson City, Tenn., for defendant-appellant.

Carl P. McDonald, Asst. U. S. Atty., for plaintiff-appellee; John L. Bowers, Jr., U. S. Atty., Charles N. Stedman, Asst. U. S. Atty., Knoxville, Tenn., on brief.

Before WEICK, McCREE and KENT,* Circuit Judges.

McCREE, Circuit Judge.

James Ambrose, a/k/a Lilly Ambrose, appeals from a jury conviction of one count of aiding and abetting the sale of non-tax-paid liquor, in violation of 18 U.S.C. § 2 and 26 U.S.C. § 5604(a)(1) (1970). He also appeals from the revocation of the probation that he had received upon his conviction of an earlier offense. The revocation was based in part upon the conviction we consider in the other appeal. We reverse the conviction and remand for a new trial in the first appeal, and we affirm the probation revocation in the second.

The Government's case consisted of the testimony of Bobby Bilbo, an undercover agent of the Alcohol, Tobacco and Firearms Division of the Treasury Department investigating sales of non-tax-paid liquor in eastern Tennessee. On direct examination, he testified that on October 1, 1971, he was driving his car on a county road when a car driven by appellant approached and passed by him in the opposite direction. Bilbo observed the car turn around and come up behind him, and he thereafter pulled over to the side of the road. Appellant stopped his car behind Bilbo's and walked over to Bilbo's car to ask whether Bilbo had seen a person for whom appellant was looking (later identified as Mickey Faulkner, an informant paid by Bilbo for information relating to sales of moonshine). Bilbo told appellant that he had not seen this man. Appellant then stated, according to Bilbo, that the man for whom he was looking knew someone who wanted to buy moonshine whiskey, to which Bilbo responded that he might be the man whom Faulkner had in mind because he (Bilbo) wanted to purchase some moonshine. The two dickered over price, and appellant indicated that he could not promise anything, but, after talking in his car with a man named Luke (later identified as

---

* Judge Kent died on May 28, 1973 and did not participate in this decision.

Luke Lyons, who was indicted with appellant but who was not tried with him), appellant told Bilbo to meet Luke and him at a local restaurant at 9:00 p. m. that night.

Bilbo testified that he rendezvoused with appellant and Luke, and that appellant told him that everything was ready. Appellant and Luke then left the restaurant for 15 minutes. Luke returned alone, and he and Bilbo went to a nearby site where 24 gallons of non-tax-paid liquor were cached. The liquor was loaded into the agent's car, Bilbo paid Luke $180 and the liquor was transported to the agent's headquarters where it was analyzed and stored. One jug from the shipment was introduced as an exhibit at the trial.

Ambrose testified in his own behalf, and admitted conversing with Bilbo on the afternoon of October 1. According to appellant, he was told by his cousin that Mickey Faulkner, the son of a local bootlegger, was looking for him, and appellant picked up Luke and attempted to find Faulkner. He was told that Faulkner had left his home with another man in a red Plymouth automobile. Appellant then drove about looking for the car —appellant was evasive about why he so doggedly pursued Faulkner that day [1]— and he stopped agent Bilbo when he saw that Bilbo was driving a red Plymouth. Ambrose testified that he asked Bilbo whether he had seen Faulkner. Bilbo responded that he had not but then asked, "Have you got any liquor?" Appellant said that he did not have any "but the boy with me might be able to help you." Luke and the agent talked for a while and agreed to meet that night. Appellant admitted being at the restaurant when Bilbo entered on the night of October 1, but he claimed that Bilbo asked him at that time whether Luke was going to help him and that he told Bilbo that he did not know although Luke had said he would be there if he could. Appellant then left the restaurant and heard nothing more about the transaction.

Appellant's only defense at trial was a claim of entrapment, and his first contention on appeal is that the district court erred in denying his motion for a judgment of acquittal at the close of the Government's case. He argued to the district court and maintains on appeal that the testimony of agent Bilbo on *cross-examination established that appellant was entrapped as a matter of law*.

In support of this contention, appellant relies principally on Bilbo's description of his undercover work and on the use of Faulkner as an informant. Bilbo admitted that he paid Faulkner $10 per day for expenses incurred in contacting people who might be willing to sell moonshine to Bilbo and then relaying to Bilbo the information that a buy could be arranged. Defense counsel pursued the point that Bilbo, by his undercover work and by his utilization of Faulkner as an informant, was in effect attempting to procure the commission of illegal acts. Bilbo admitted, in response to questioning by defense counsel, that he did attempt to induce people to sell him moonshine. Appellant stresses particularly the following exchanges:

Q And most of these other things that happened follow along in the lines of what I have been asking you about; in other words, making contacts and trying to procure or induce a violation of the law. Is that correct, sir?

.   .   .   .   .   .   .

A True.

Q . . . [I]t is true, is it not, that you have calculated this scheme and went about it in such a way and manner that you intended for it to produce a violation of the law. Is that correct, sir?

A Yes, sir.

---

1. Appellant on cross-examination indicated that Faulkner might have desired to buy or sell a motor vehicle since appellant apparently dabbled in the used-car business. Transcript at 102.

(Transcript at 24, 30.) Because Bilbo admitted sending Faulkner out to assist him in making purchases, because Bilbo admitted on recross-examination that he had given appellant's name to Faulkner as a person who might be interested in selling moonshine, because Faulkner had made it known to appellant on October 1 that he desired to see Bilbo, and because appellant was looking for Faulkner whom he knew to be in a red Plymouth with another man, appellant contends that Bilbo's testimony established as a matter of law that appellant was induced into aiding and abetting the sale of non-tax-paid liquor, and therefore that the Government did not prove beyond a reasonable doubt that he was not entrapped. Accordingly, the court should have granted his motion for a judgment of acquittal at the close of the Government's case.

There are a number of infirmities in appellant's argument that require us to reject it.

■ First, by presenting evidence, appellant waived objection to the denial of his motion, although by renewing the motion at the close of all the proofs, he preserved the question of the sufficiency of the evidence on the record taken as a whole, United States v. Maffei, 450 F.2d 928, 930 (6th Cir. 1971), cert. denied, 406 U.S. 938, 92 S.Ct. 1789, 32 L.Ed.2d 138 (1972).

■■ Second, in considering whether sufficient evidence supports the jury's verdict, we do not decide whether the Government has proved the defendant guilty beyond a reasonable doubt; our role is limited to a determination whether the evidence sufficed to permit the jury to find him guilty beyond a reasonable doubt. United States v. Luxenberg, 374 F.2d 241, 248 (6th Cir. 1967); United States v. Ragland, 306 F.2d 732, 735 (4th Cir. 1962), cert. denied, 371 U.S. 949, 83 S.Ct. 504, 9 L.Ed. 2d 498 (1963). And, only when undisputed facts establish that the criminal design originated with the Government agent, that the agent implanted in the mind of an innocent person the disposition to commit the offense, and that the defendant then committed the offense at the urging of the Government agent can we conclude that entrapment was established as a matter of law. Sherman v. United States, 356 U.S. 369, 372–373, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932); United States v. Head, 353 F.2d 566, 568 (6th Cir. 1965).

■ In applying these tests, we conclude that the case was properly submitted to the jury and that there was ample evidence to support the verdict of guilty. Bilbo's responses on cross-examination at most constituted testimony from which the trier of fact could have found inducement on the part of the Government agent. But establishing that an agent worked in an undercover capacity to earn the trust of participants in an illegal enterprise and to feign a *bona fide* interest in furthering their illicit goals does not establish the defense of entrapment. Only when the agent overbears an otherwise innocent person's will and thereby induces him to commit a criminal act that he was not disposed to commit has the agent engaged in conduct affording a complete defense to conviction of the offense. A defendant's predisposition is the "principal element in the defense of entrapment," United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (U.S. April 24, 1973), and he should be acquitted only if the jury concludes (or the undisputed evidence demonstrates as a matter of law) that there is a reasonable doubt whether he was predisposed to commit the crime. *See* United States v. Russell, *supra*; United States v. Eddings, 478 F.2d 67, 71–72 (6th Cir. 1973). Thus, Bilbo's responses on cross-examination must be viewed in context with other evidence in the case from which the jury might have concluded that Ambrose was merely an "unwary criminal." Sherman v. United States, *supra*, 356 U.S. at 373, 78 S.Ct. 819.

In this respect, Bilbo testified on direct examination that it was appellant who initiated conversation about the sale of moonshine, and that appellant dickered over price before he would agree to assist Bilbo in making a buy. Bilbo also testified that appellant told him at the restaurant on the night of October 1 that "everything was ready" and that appellant would check to make sure that all was in order. Appellant himself testified on direct examination that, after searching for Faulkner all over town and ascertaining that Faulkner was not with Bilbo, he told Bilbo that he did not have any liquor to sell although Luke might be in a position to prove helpful in this regard.[2] We think that the jury might well have concluded beyond a reasonable doubt from this evidence that appellant was predisposed to assist in the sale of non-tax-paid liquor and that the Government agent merely afforded the opportunity for the commission of the offense. Sherman v. United States, *supra,* 356 U.S. at 372, 78 S.Ct. 819; Sorrells v. United States, *supra,* 287 U.S. at 441, 53 S.Ct. 210; *see* United States v. Head, *supra,* 353 F.2d at 568–569; United States v. Burkhart, 347 F.2d 772, 775 (6th Cir. 1965); United States v. Lile, 290 F.2d 225, 226 (6th Cir. 1961).

Appellant's second contention on appeal relates to testimony elicited by the Government on two occasions that tended to show that appellant was predisposed to sell non-tax-paid liquor.

The first of these involved appellant's oft-repeated assertion during the trial that he had not had anything to do with liquor for two years. On direct examination, he made this assertion twice, although it is not clear whether he meant that he had told Bilbo in October 1971 that he had not been involved with liquor in two years or that he had not been involved with it for the two years prior to trial.[3] On cross-examination, the following colloquy occurred between appellant and the United States attorney:

I believe your counsel asked you a question, "You haven't had anything to do with illegal whiskey for two years." Is that correct?

A Longer than that, I would say.

Q Two years from October 1st and all the way up until now. Is that right?

A That's right.

Q Were you working at the Amvet, which I understand is a private club. Is that correct?

A American Veterans, yes.

Q During the last week of August this year?

A Yes, sir.

Q Was that place raided this year?

A Yes.

---

2. Appellant appeared to regard this as an innocent act of Christian charity, and he blamed his current predicament on the fact that

> . . . all my life I have tried to help people. That's right. If a man comes and asks me a question, I try to tell him and if I could help a man, I would help him. I am not no backstabber. I try to help a man. That's all I can do and that is the reason I am here because I tried to help a man.

Transcript at 70. Again, on cross-examination:

> I didn't have no intention of aiding in [the sale of liquor], but I will, if you come to my place today and ask where somebody lives or say, "Do you know where I can find this?" And I would say, "Yes, you might get it from so and so." And that is

the reason I am sitting right here. I never sold nothing.
Transcript at 77.

3. On direct examination, while recounting his version of the roadside discussion he carried on with Bilbo, appellant testified: Then he asked me, he said, "Have you got any liquor" And I said, "No, I ain't fooling with no liquor." I ain't fooled with no liquor for over two years.
Transcript at 65. Appellant testified that the agent approached him a few days after the October 1 transaction and asked whether he knew of anyone who sold liquor, and that he told the agent that he might obtain liquor anywhere in the area "but I ain't fooling with it. I ain't fooled with it for two years." Transcript at 67.

Q Do you know what was seized at the time of the raid?

A Yes.

Q What?

A Well, there was several things. There was some white whiskey found out behind the place and along the railroad track in weeds and stuff.

Q Were you there?

A Yes.

Q Were you there near the white whiskey?

A I am charged in it, yes, sir. I walked out the back door after I had been wiping the counter off and there was a bunch of questions. I was charged in it.

Q Four gallons of non-tax paid whiskey?

A Yes, sir, but it wasn't found on the club.

Q Fine. That's true. And this Recreation Center only had pool. Is that correct?

A Yes.

Q When you were working there?

A Had pool tables, pinball machines, juke box, soft drinks, and no alcohol nor nothing there.

(Transcript at 91–92.) Appellant contends that this exchange amounted to the introduction of evidence of a prior indictment or transaction by the prosecution for the purpose of showing that he was predisposed to sell liquor, or that it was an attempt by the prosecution to impeach his credibility by referring to his prior misconduct. Under either theory, he argues, this line of questioning was impermissible.

In response, the Government points out that it was appellant who volunteered the information that he had been indicted in the aftermath of the raid and that no objection to these questions was interposed by defense counsel. Appellee characterizes the questions as an attempt to impeach appellant's specific statement that he had not been involved with liquor for a substantial period of time before trial.

■■ We agree with appellant that permitting the prosecution to make a searching inquiry into the predisposition of a defendant who raises the defense of entrapment does not thereby provide a license for the prosecution to roam at will through his past, either by the introduction of extrinsic evidence or by the use of cross-examination. The Government is constrained by familiar rules of relevancy and competency, by policies against undue prejudice or unfair surprise, and by considerations pertaining to limitation of the range of issues with which juries must grapple, the trial judge's ability to control the conduct of the trial, and the confinement of cross-examination to matters raised on direct. Thus, although the prosecution is not circumscribed, when the defense of entrapment is raised, by the usual rules against the introduction of character evidence or evidence of prior acts, *see* United States v. Owens, 346 F.2d 329, 332–333 (7th Cir.) cert. denied, 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965); United States v. Cooper, 321 F.2d 456, 457–458 (6th Cir. 1963); Whiting v. United States, 296 F.2d 512, 516–517 (1st Cir. 1961), the proffered evidence may be held inadmissible because of its remoteness from the offense charged or its hearsay nature, *see* United States v. Johnston, 426 F.2d 112, 113–114 (7th Cir. 1970); Whiting v. United States, *supra*, 296 F.2d at 518–519, or because of its unreliability or potential for unfair prejudice, *see* Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219, 226 (1962) (en banc).

■ But in this case we do not have to decide whether the reference to a police raid on a club in which defendant was working constituted admissible evidence of predisposition. Nor must we determine whether the prosecution offended the rule prohibiting the introduction of extrinsic evidence of specific instances of bad conduct to impeach the character of a witness. *See* United States v. Beno, 324 F.2d 582, 588–589 (2d Cir. 1963), cert. denied, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1963);

IIIA. J. Wigmore, Evidence §§ 979, 1005(a) (Chadbourn rev. 1970); or the use of prior indictments to impeach character, *see* United States v. Yarbrough, 352 F.2d 491, 493 (6th Cir. 1965); J. Wigmore, *supra*, § 980a; or the use of cross-examination as a vehicle by which to introduce this type of evidence without formally offering it, *see* Cutshall v. United States, 252 F.2d 677, 679 (6th Cir. 1958); Packineau v. United States, 202 F.2d 681, 688 (8th Cir. 1953). Not only did appellant not object to this line of questioning, but it is also clear that the Government was attempting to show only that appellant had lied about a fact he gratuitously interjected in his direct testimony so that he would appear in a better light before the jury.[4] There is no reason why the Government should be unable to prevent a defendant from profiting by such a misstatement. *See* Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); United States v. Beno, *supra*, 324 F.2d at 588. And, because defendant did not by objection test the relevancy or probative value of this evidence, we will not consider whether the district court abused its discretion in allowing the evidence to come in. *See* Daniel v. United States, 268 F.2d 849, 852–853 (5th Cir. 1959); Ray v. United States, 255 F.2d 473, 475 (4th Cir. 1958).

A more substantial question is presented, however, with respect to the prosecution's eliciting of certain hearsay testimony from agent Bilbo in an attempt to show why appellant was suspected by the ATF in the first place. After defense counsel had cross-examined Bilbo and had obtained the admissions quoted above concerning the agent's attempt to procure the commission of an illegal act by appellant, the following colloquy occurred on redirect examination:

Q Mr. Bilbo, what, if any, information or knowledge did you have, and the extent thereof, as to Mr. Ambrose prior to October 1, 1971?

MR. BAUTISTA: We are going to object to that unless it is based upon his own personal knowledge, if your Honor please.

THE COURT: No, he is an investigating officer and he has a right to take information given him, as well as his own knowledge, and now that the defense of unlawful entrapment has been raised by questions, the Government can show the reputation that this man had with the officers, and also any specific information they claim to have had about him. The objection is overruled.

A Yes, Mr. Lilly Ambrose was known to me prior to October 1 as a violator of the moonshine liquor laws. In our office here in Greeneville, we keep a list of people who are in the moonshine liquor business. Information is given to us by people in the area. We keep a card of every individual turned in to us as being in the liquor business. We also have what we call an atlid list. These are people who are major violators in the area, more so, the bigger violators than other people. Mr. Ambrose does appear on these atlid lists which comes from our office and goes to the state office in Nashville and back to us, and is posted on our board down in the Post Office in our office downstairs.

Q On October 1, 1971, you had previous knowledge of the reputation of the defendant as to dealing in illegal distilled spirits?

A Yes.

Transcript at 34–35. On recross-examination, defense counsel questioned Bilbo

4. We observe, however, that the Government attorney was in error when he referred to the fact that defense counsel had asked on direct examination whether defendant had been away from illegal liquor for two years; no such question was in fact put by defense counsel. Further, defendant did not characterize himself as having been away from *illegal* liquor for two years, as the Government attorney suggested.

about the reliability of this "atlid list" [5] on which appellant's name had been placed by someone in the local ATF office:

Q   Mr. Bilbo, you say you keep a card file.  What was the term that you used?

A   Atlids file.

Q   What does that mean?

A   You have got me.  I can't answer that.  Just like we have a major violator file.  People are put on a major violator file and are put on the atlids file.  It is broken down into counties.

Q   This information comes from the area of different sources?

A   Right.

Q   It comes from known bootleggers, doesn't it?

A   From known bootleggers, other investigators and citizens.

Q   Informants?

A   Informants.

Q   Some of it is reliable and some of it is not reliable?

A   That's true.

Q   It has turned out to be such, hasn't it?

A   That's true.

Transcript at 43–44.

■   Appellant contends that it was error for the district court to allow the Government to introduce testimony about the atlid list because by the agent's own testimony the list was not reliable.  The Government, on the other hand, contends that this testimony was properly admissible as evidence of appellant's reputation and thus of his predisposition.  *E.G.*, Sorrells v. United States, *supra*, 287 U.S. at 451–452, 53 S.Ct. 210; United States v. Ball, 428 F. 2d 26, 32 (6th Cir. 1970), cert. dismissed, 400 U.S. 801, 91 S.Ct. 7, 27 L. Ed.2d 33 (1970).  We agree with appel-

lant that admission of the reference to the atlid list requires reversal.

On this point we can add little to the excellent discussion of Judge Hartigan in Whiting v. United States, *supra*, in which the Government attempted to show predisposition of the defendant by calling as rebuttal witnesses a police officer who testified that he received anonymous telephone calls informing him that the defendant trafficked in narcotics, and another police officer and a Government agent who testified that informants had told them that the defendant was involved in the narcotics trade but who admitted that they did not know of any basis for the informants' knowledge of the defendant's activities.  In reversing the judgment of conviction, the court held that the hearsay evidence introduced by the Government was impermissibly unreliable and afforded the defendant no fair opportunity to rebut it:

The Government argues that proof of general reputation is admissible to demonstrate predisposition and there is language in the cases to support this.  (See, e.g., Justice Roberts concurring in Sorrells).  However, acceptance of this hypothesis does not resolve the problem facing us here for it is one thing to say that proof of reputation is admissible to show character and quite another to say that this reputation may be established by hearsay evidence of the type involved here.  It is fundamental that to qualify a witness as competent to give testimony concerning a defendant's character and reputation in the community it is usually required that there be a showing that the statements uttered by the witness are representative.  It is generally required that the witness must show that he lives or works in a given community and is familiar with the reputation of the defendant.  In short, there must be some demonstra-

---

5.  At oral argument, no one was able to inform us of the derivation of the term "atlid list."  We may speculate that it is an acronym for "alcohol and tobacco law identification."

ble basis evincing the competence of the witness to give his opinion. See generally, Wigmore on Evidence, 3d Ed. § 191, §§ 1610–1616; see also Deschenes v. United States, 10 Cir., 224 F.2d 688 (1955); Riebe v. United States, 9 Cir., 82 F.2d 564 (1936); Minkow v. United States, 4 Cir., 5 F. 2d 319 (1925). Here it is patent that neither the testimony of Captain Collins, Agent Waddock nor Sergeant Kane would qualify under the usual rules regarding the competency of a reputation witness. All were allowed to tell the jury that the defendant was a vendor of narcotics yet none knew this of his own personal knowledge. Moreover, from all that appears from the record this hearsay may well have been compounded. In the case of the testimony of Captain Collins, he admitted that he had no idea whether his callers ever personally knew the appellant, or were even from the Springfield area. Similarly, in the case of the testimony of Agent Waddock and Sergeant Kane, there was no discernible showing that their informants knew the appellant, had seen him in the Springfield area or, finally, whether their information was in any wise first hand. However, this testimony was admitted as relative and probative of the appellant's predisposition to commit narcotics offenses. Stripped to its essentials the argument of the Government is quite simply that hearsay testimony is admissible to show the predisposition of the appellant. Yet beyond stating that this practice is sanctioned where entrapment is raised, the Government has not offered, nor can we perceive any sound reason, save that of expedience, why this should be. If Dobson and Miss Brewer were competent to testify as to the general reputation or character of the appellant and thus to his predisposition, it would seem a matter of elemental fairness that they should be called by the Government to so testify in open court.

. . . [I]f we were to concede, a question we need not decide, that evidence of such an insubstantial character as the "anonymous phone calls" might be paraded before a jury in an avowed attempt to demonstrate good cause for setting out to ensnare the appellant, this assuredly is not to say that this same evidence is competent to portray a defendant's predisposition to commit the offense. And yet under the instructions of the district judge, this evidence was admitted to show predisposition as well as good cause. It is one thing to conduct an inquiry into the appellant's past conduct and elicit the fruits of this search by competent evidence to show evil proclivities. It is quite another to attempt to accomplish this same objective by lofting into the jury box the basis of officials' suspicion, however evidentiary ephemeral these latter may be.

Here, at least, in the case of the anonymous phone calls, it could well be said that the evidence " * * * was so indefinite that it gave the defendant no chance or opportunity to refute it. It specified no person who made any of the complaints to which [the agent] testified. It specified no time when, place where, or circumstances surrounding any such complaints which could give the defendant any chance or opportunity to refute or contradict the testimony regarding such complaints, * * *." Mattson v. United States, 8 Cir., 7 F.2d 427, 428 (1925). We believe that to the extent that testimony of this character might be utilized by a jury to assay the appellant's predisposition to commit narcotic offenses, its judgment would be but a surmise from the shadows—a guess in the dark. Accordingly, we conclude that the admission of hearsay evidence of the character here in issue to show the predisposition of the appellant was highly prejudicial error.

296 F.2d at 517–519. *See also* Waker v. United States, 344 F.2d 795, 797 (1st

Cir. 1965); United States v. Neff, 343 F.Supp. 978, 981–984 (E.D.Pa.1972); *cf.* United States v. Johnston, *supra,* 426 F.2d at 113–114; Hansford v. United States, *supra,* 303 F.2d at 225–226.

Agent Bilbo admitted that the atlid lists consists of names supplied by anonymous informants. He admitted that some of this anonymous information has proved reliable and some has not. On such ephemeral evidence, without even an attempt to satisfy the requirements ordinarily imposed upon the introduction of reputation evidence, the Government based its argument to the jury that appellant was predisposed to sell non-tax-paid liquor. This evidence would not even be sufficient to establish that the agent had good cause to suspect appellant (assuming that is a relevant inquiry), let alone competent to show that appellant possessed the requisite guilty intent. If in fact appellant has a reputation in the community for dealing in moonshine, that should be simple enough for the Government to establish in the usual fashion on retrial, although in light of the competent evidence to which we have alluded *supra* relating to appellant's predisposition, we question whether the Government will find it necessary to introduce reputation evidence at all. But upon reviewing the record, we cannot say with any certainty that the error in admitting the testimony about the atlid list did not "affect substantial rights" of appellant, Fed.R.Crim.P. 52(a), and therefore we reverse his conviction and remand for a new trial.

▮▮▮ Because the case will be retried, we consider it appropriate to comment on appellant's attack upon the court's instructions to the jury:

If you should find that Mr. Ambrose had no previous intent or purpose to commit the offense with which he is charged here, but did so only because he was induced, or persuaded to do so by Mr. Bilbo or Mr. Faulkner, then you would find that he was unlawfully entrapped and find him not guilty of the charge against him.

On the other hand, it you should find that Mr. Ambrose was ready and willing to engage in the type of unlawful conduct with which he is charged here, whenever such an opportunity was offered to him, then you would find that the employee or agent of the Government merely offered him an opportunity to entrap himself, and you would not accord him the benefit of the defense of unlawful entrapment.

Transcript at 127. Appellant contends that this instruction required the jury to find that he was not predisposed before the jury could acquit him, and thus he was deprived of the opportunity to be acquitted if the jury should have entertained a reasonable doubt about his predisposition. See Notaro v. United States, 363 F.2d 169, 176 (9th Cir. 1966). We agree with appellant that this part of the charge was erroneous,[6] and that a better formulation would have been that which we recently approved in United States v. Eddings, *supra,* 478 F.2d at 72, n. 1, to the effect that if the jury should find beyond a reasonable doubt that the defendant was predisposed to commit the offense, then he is not a victim of entrapment, but that if the evidence leaves the jurors with a reasonable doubt about the de-

---

6. Contrary to the Government's assertion, our decision in United States v. Shameia, 464 F.2d 629 (6th Cir. 1972), in which we held that a defendant who does not admit to having performed every act necessary to the commission of the offense charged may not raise the defense of entrapment, does not require that we preclude appellant from utilizing this defense or requesting that the jury be charged on it. Appellant's testimony about his bringing together of agent Bilbo and Luke, *see* note 2 *supra* and accompanying text, constituted a sufficient admission of his participation in the illegal scheme to warrant his asserting the defense of entrapment, as did his other testimony regarding the circumstances of the meeting at the restaurant on the night of October 1.

fendant's predisposition, then he should be acquitted.[7]

Appellant further complains that the court confused the jury with respect to the existence of the various burdens of proof on the entrapment issue and that the court improperly required that the jury find that the issue of entrapment existed before it could consider whether the Government had carried its ultimate burden of proof.[8] Although the charge was correct in pointing out that the defendant was required to introduce evidence of inducement before the prosecution would be required to prove beyond a reasonable doubt that the defendant was predisposed, *see, e. g.,* United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952), we consider it preferable for the district court to charge, as in *Eddings*, about the issue of predisposition and to charge generally about the prosecution's burden of proof in criminal cases, rather than to create possible confusion in the minds of the jurors by speaking of shifting respective burdens. *See* United States v. Eddings, 478 F.2d at 72, n. 1; Notaro v. United States, *supra*, 363 F.2d at 174–176. Thus, as we held in *Eddings*, the jury must be told that the Government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. 478 F.2d at 73.

As for appellant's claim that the charge was unduly confusing in its reference to "lawful" and "unlawful" entrapment, we have previously approved a charge incorporating that distinction, United States v. Thompson, 366 F.2d 167, 175–176 (6th Cir.), cert. denied, Campbell v. United States, 385 U.S. 973, 87 S.Ct. 512, 17 L.Ed.2d 436 (1966), and we are not persuaded that we should revoke this approval. *See* discussion in Robison v. United States, 379 F.2d 338, 345–347 (9th Cir. 1967). And, we do not believe that the court unfairly singled out the defendant for special scrutiny when it instructed the jury that the defendant's interest in the case did not of itself make him unworthy of belief.

In case No. 72–2190, appellant contends that the court erred in revoking the probation that had been previously imposed by a federal court in North Carolina in 1969 for conviction of violation of 18 U.S.C. § 472. The revocation was based in part on the indictment of appellant in 1972 for the possession of non-tax-paid liquor and gaming devices and possession of beer for resale without a license, and in part on appellant's conviction in No. 72–2191 for aiding and abetting the sale of non-tax-paid liquor. Appellant contends that the court was premature in considering these factors before any final convic-

---

7. We observe that the court did subsequently charge:

The burden of proof is different on each side and shifts on this entrapment issue. First, Mr. Ambrose had the burden of proving by the greater weight of the evidence that he was unlawfully induced by Mr. Bilbo or Mr. Faulkner to act unlawfully. If you find that Mr. Ambrose carried this burden, then the burden shifts back to the prosecution to have proved beyond a reasonable doubt that Mr. Ambrose was ready and willing, without any persuasion to break the law, and merely awaited a good opportunity to commit the offense with which he is charged; in other words, that the entrapment of him was lawful.

Thus, if you should find that Mr. Ambrose was unlawfully entrapped by the actions of Mr. Bilbo or Mr. Faulkner, then you should find Mr. Ambrose not guilty. On the other hand, if you should find that Mr. Ambrose

was lawfully entrapped by the Government, then you may find Mr. Ambrose guilty.

Before you may vote to convict Mr. Ambrose of this charge, it must have been shown by the proof beyond a reasonable doubt that Mr. Ambrose was ready and willing, without any persuasion, to break the law as charged in the second count of this indictment and merely awaited a good opportunity to commit the offense charged, in other words, that he was lawfully entrapped.

Transcript at 127–28. And, the court gave a general instruction regarding the prosecution's burden of proving appellant guilty beyond a reasonable doubt, Transcript at 116–17, as well as emphasizing a number of times that the prosecution bore this burden on every element of the offense charged. *E.g.*, Transcript at 118, 123, 131.

8. *See* note 7 *supra*.

tions resulted. We hold that the court did not abuse its discretion in revoking appellant's probation in the circumstances of this case. Conviction of an offense is not a necessary predicate for the revocation of probation. United States v. Chambers, 429 F.2d 410, 411 (3d Cir. 1970; United States v. Markovich, 348 F.2d 238, 240–241 (2d Cir. 1965).

In No. 72–2191, the judgment is reversed and the cause is remanded for a new trial; in No. 72–2190, the judgment is affirmed.