UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard MURZYN, a/k/a "Mo Mo", and
RUSSELL HALL,
Defendants–Appellants.

Nos. 79–1855, 79–1861.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1980.

Decided Oct. 3, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 30, 1980.

Robert B. Coughlin, Smith & Funk, Hammond, Ind., Michael G. Cheronis, Chicago, Ill., for defendants–appellants.

Douglas B. Altman, Asst. U.S. Atty., Hammond, Ind., for plaintiff–appellee.

Before PELL and BAUER, Circuit Judges, and CROWLEY, District Judge.*

BAUER, Circuit Judge.

In these consolidated appeals from their convictions after a joint trial on charges

* The Honorable John Powers Crowley, Judge of the United States District Court for the North-ern District of Illinois, Eastern Division, is sitting by designation.

involving the interstate transport and sale of stolen automobiles, the defendants contend that they were by various means denied a fair trial. Specifically, defendant Richard Murzyn argues that he was deprived of a fair trial by the introduction of evidence of his past misconduct to prove his predisposition to commit the crimes charged and to negate his defenses of coercion and entrapment; by the omission of an instruction on the pertinence of the past misconduct evidence; by an erroneous instruction on the co–conspirator hearsay rule; by various instances of prosecutorial misconduct and trial court errors; by the inadequacy of the representation afforded him by counsel; and by the admission of evidence concerning eight acts of intrastate auto theft charged as overt acts in the indictment's conspiracy count. Defendant Russell Hall contends that he was deprived of a fair trial by the denial of his motion for severance and by the trial court's comment on a piece of identification evidence. We find the trial to have been fair and free of prejudicial error.

## I.

This case arose out of an undercover investigation conducted between April and September of 1978 concerning the trade in stolen, late–model, luxury cars in northern Indiana. The investigation, which was centered in Hammond, Indiana, was run jointly by the Federal Bureau of Investigation and the Indiana State Police.

On May 8, 1978, Indiana State Police officer Joseph Fitch, then posing in an undercover role as Joe Fields, a stolen car fence from southern Indiana, was introduced to defendant Murzyn by Louis Ferguson, a paid police informant with an extensive criminal record and a long–time acquaintance of Murzyn's. According to testimony by Fitch and Ferguson, which Murzyn disputed at trial in his own direct testimony, Murzyn offered at this meeting to supply Fitch with stolen cars. The remainder of the government's case was largely

devoted to evidence concerning a series of preliminary meetings and negotiations between Fitch and Murzyn, the fruition of these negotiations in the separate delivers to Fitch of ten stolen Lincolns and Cadillacs, and the ultimate apprehension and arrest of Murzyn and of two persons alleged to have stolen the cars and delivered them to Fitch while in Murzyn's employ. One of these two persons was defendant Hall.[1]

Murzyn's defense at trial centered on an effort to prove that one John Stechalski, then deceased, had been the leader of the car theft ring and that Murzyn had merely undertaken the role of go–between for Fitch and Stechalski because he feared for his life. Specifically, Murzyn sought to show that various statements and actions by informant Ferguson and by Fitch caused him to believe that if he did not aid Fitch in securing stolen cars he might be seriously harmed either by Fitch or by a supposedly dangerous friend of Ferguson named Ray Sanders. Hall's defense was that of mistaken identification.

The jury found Murzyn guilty on each count of the seven–count indictment: He was convicted on three counts of interstate transportation of stolen vehicles in violation of 18 U.S.C. § 2312, on three counts of interstate sale of stolen vehicles in violation of 18 U.S.C. § 2313, and on one count of conspiracy to commit the above crimes in violation of 18 U.S.C. § 371. Murzyn was sentenced to a total of sixteen consecutive years of imprisonment and was fined $21,-000.

Hall had been charged only with two counts of interstate transport and two counts of interstate sale of stolen vehicles and with conspiracy. He was convicted by the jury on those counts and was sentenced to five years of imprisonment each count, the sentences to run concurrently.

## II.

Murzyn first contends that his defense was prejudiced and his trial rendered fun-

---

1. The other person, Dennis Matthews, was indicted along with Murzyn and Hall and pleaded guilty prior to trial. Matthews was convicted and sentenced on the basis of that plea.

damentally unfair by the government's introduction of evidence of his prior misconduct to prove that he had not been entrapped or coerced. The evidence complained of is that Murzyn once put a gun to the head of a federal agent then working undercover and asked, "Are you a fed?"; that he solicited Fitch's and Ferguson's services for the assassination of one Bruce Green, whom he purportedly described as a "nigger drug pusher" who was interfering with Murzyn's drug trade; that he used both crude sexual slang and derogatory racial slang; that he told Fitch that he had stolen trees from a nursery, shrubbery from a cemetery, and a cupola from a construction site; that he offered to produce Stechalski for Ferguson and Fitch so that they could beat him up, that he said he had obtained stolen rifles from Stechalski; and that he displayed a shotgun to Fitch and once, without explanation, fired five rounds from a rifle into a lake in Fitch's presence.

The seminal statement concerning the use of prior misconduct or other character evidence to demonstrate predisposition and thus rebut a defense of entrapment appears in *Sorrells v. United States*, 287 U.S. 435, 451–52, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932):

The predisposition and criminal design of the defendant are relevant. But the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials. If that is the fact, common justice requires that the accused be permitted to prove it. The government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, and if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense.

Since *Sorrells*, appellate courts have endeavored to impose "appropriate" and reasonable restraints on the use of character evidence to prove predisposition. The resulting rulings reflect the approach to character evidence taken in the Federal Rules of Evidence[2] and hold, as a general proposi-

2. The relevant Federal Rules of Evidence are Rules 404 and 405. Rule 404 provides, in pertinent part:

(a) *Character evidence generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

\* \* \* \* \* \*

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 405 provides,

(a) *Reputation or opinion.* In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross–examination, inquiry is allowable into relevant specific instances of conduct.

(b) *Specific instances of conduct.* In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

As we read these rules, assertion of an entrapment defense falls within the ambit of Rule 404(a)(1) because it puts the accused's predisposition to commit the crime in issue. Accordingly, the government is entitled to rebut an entrapment defense by evidence of the accused's character introduced to prove that he "acted in conformity therewith" and was, at the relevant time, predisposed to commit the crime charged. Under Rule 405(b), the government may do this by resort to evidence of the accused's prior specific acts. This is the case because predisposition is, in effect, an "essential element" of the government's case once the issue of entrapment has been raised; thereafter, the government is required to prove beyond a reasonable doubt that the accused was predisposed to commit the crime and was not

tion, that character evidence may be used to prove predisposition, if its probative value outweighs its potential for unfair prejudice. *See, e. g., United States v. Ambrose,* 483 F.2d 742, 748 (6th Cir. 1973); *United States v. Johnston,* 426 F.2d 112, 114 (7th Cir. 1970); *Hansford v. United States,* 303 F.2d 219, 225–26 (D.C.Cir.1962) (in banc); *see also United States v. Brown,* 453 F.2d 101, 108 (8th Cir. 1971), *cert. denied,* 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972); *Whiting v. United States,* 296 F.2d 512 (1st Cir. 1961), *cert. denied,* 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963).

In balancing probative value and the potential for unfair prejudice to determine if a given item of character evidence may be used to prove predisposition, the courts have emphasized various factors. First, and most basic, is the requirement that the character evidence be relevant to the predisposition issue. *United States v. Ambrose, supra.* Given the minimal nature of the relevancy requirement under the federal rules,[3] however, relevance will often be present. Second, character evidence that is relevant to the accused's predisposition to commit the crime charged may be of diminished probative value, and may thus be found inadmissible, because it is hearsay; is remote in time from the crimes charged; is uncorroborated and otherwise suspect; is introduced without warning to the accused, who may not, as a consequence, be able to defend against it; or is indicative of character traits that are only minimally relevant to the accused's predisposition. *See, e. g., United States v. Ambrose, supra; United States v. Johnston, supra; Hansford v. United States, supra; Whiting v. United States, supra.*[4] Third, it may also be inferred from the process of balancing probative value against unfair prejudice that character evidence that is relevant to and highly probative of predisposition may sometimes be found inadmissible because its inflammatory nature presents too great a danger of prejudicing the jury against the accused. *Cf. United States v. Ostrowsky,* 501 F.2d 318, 321–23 (7th Cir. 1974).

◼ We think this balancing approach applies not only to the use of character evidence to demonstrate predisposition and rebut an entrapment defense, but also, under certain circumstances,[5] to its use to demonstrate an absence of compulsion and thus to rebut a defense of coercion. Coer-

entrapped. *E. g., United States v. Townsend,* 555 F.2d 152, 158 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977).

We recognize that the use of prior crimes, wrongs, or specific acts to prove predisposition to commit the crime charged can be viewed as a proof of the accused's character "in order to show that he acted in conformity therewith," and thus can be thought in conflict with Rule 404(b). We read Rules 404(a)(1) and 405(b) as being consistent with Rule 404(b), however, and reconcile them by finding that one of the "other purposes" mentioned in Rule 404(b) is proof of predisposition. Predisposition is similar to other objects of proof mentioned in Rule 404(b) both in that it involves the mental state of the accused at a given time and in that it is often, in effect, an essential element of the government's case. To otherwise interpret Rule 404(b) would, we think, disturb the holding in *Sorrells v. United States, supra,* that a "searching" inquiry into predisposition is allowed.

Evidence of predisposition in the form of character evidence is, of course, subject to the qualifications on admissibility contained in Fed. R.Evid. 403, and especially, as is discussed in text *infra,* to the qualification stated in that rule

that the probative value of the evidence must outweigh its potential for unfair prejudice.

3. *See* Fed.R.Evid. 401.

4. In this regard, some courts have indicated that, at least with respect to the use of evidence of prior crimes to prove predisposition, the prior crimes must be similar to the crimes charged. *E. g., DeJong v. United States,* 381 F.2d 725, 726 (9th Cir. 1967); *cf. United States v. Brown, supra; United States v. Owens,* 346 F.2d 329, 332–33 (7th Cir.), *cert. denied,* 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965).

5. Character evidence will not always be relevant to a coercion defense. In extreme cases, the issue of coercion may relate not to the accused's mental state but to whether or not the accused was, for example, forced at gunpoint to take a given action. Obviously, mental state and character evidence would be beside the point under such circumstances. On the other hand, if the accused asserts that he was subtly coerced by threats or intimidation, evidence of the accused's character is relevant to show whether or not he was likely to have been influenced by such pressures.

cion at the hands of government officials is an "extreme form of entrapment." *United States v. McClain*, 531 F.2d 431, 438 (9th Cir. 1976); *cf. United States v. Townsend, supra*, 555 F.2d at 155 n.3. An accused who asserts government coercion contends that his will was overborne not simply by persistent inducement or tantalizing persuasion, as in the more typical entrapment situation, but by threats, intimidation, or even force. He thus places his character and mental state at issue as does the accused who claims to have been entrapped, and evidence of character bearing upon that issue is similarly admissible to prove either the absence of coercion or the presence of predisposition.

In applying this balancing approach to the facts of this case we note first that none of the evidence of which Murzyn complains was introduced by the government in its case–in–chief. Murzyn himself introduced in his direct examination of informant Ferguson the fact that he had offered to deliver Stechalski to Ferguson and Fitch,[6] and the remainder of the character evidence was introduced by the government to rebut Murzyn's evidence on the entrapment and coercion defenses. Thus Murzyn introduced, among other things, testimony that Fitch had forced Murzyn to give him an expensive dog; that Murzyn had given Ferguson an artist's print of some value; that Fitch had always carried a gun when visiting Murzyn and had displayed guns to Murzyn; that Fitch had appeared to dominate and to intimidate Murzyn; that Fitch had told Murzyn that he had killed a "nigger"; that Fitch had used crude sexual and racial slang; that Ferguson had threatened Murzyn by indicating that his friend Sanders, who had been suspected along with Ferguson of a murder, would protect Ferguson against his enemies; and that Fitch and Ferguson had told Murzyn, in effect, that he had better supply them with stolen cars "or else." Taken together, this evidence portrayed Murzyn as timid and fearful of Ferguson and Fitch, whom he perceived to be killers that would enforce their requests with violence.

Turning now to the testimony of which Murzyn complains, we note that it was, in the main, narrowly geared to rebut the exact issues Murzyn himself had interjected at trial. The testimony that Murzyn had held a gun to the head of a government officer during a prior investigation and had asked, "Are you a fed?"; had solicited the assassination of a rival drug pusher; had obtained stolen rifles from Stechalski; had displayed guns to Fitch; and had abruptly fired one several times in Fitch's presence spoke directly to the issue of whether Murzyn was intimidated by Fitch, by firearms, or by persons who carried or used firearms. The probative value of this evidence on the issue of coercion, as Murzyn himself had chosen to frame that issue, was high.[7] The danger of unfair prejudice was, given the context in which the evidence was admitted, less great. Murzyn had been shown by overwhelming evidence to have participated in the auto thefts. The only real issue for the jury was whether or not he had been coerced or entrapped. The government's rebuttal evidence, which tracked closely the manner in which Murzyn had presented those defenses, was unquestionably understood by the jury to relate to the coercion

---

**6.** This matter became an issue at trial because Ferguson had been beaten and robbed by Stechalski, possibly at Murzyn's behest, and had demanded satisfaction. Murzyn's version of the story was that he had been asked to produce Stechalski; the government's version was that he had offered to do so. A taped conversation between Murzyn and Ferguson tends to corroborate the government's version of the story.

**7.** The evidence of which Murzyn complains was not hearsay under the Federal Rules of Evidence, was not remote in time from the offenses charged, and was not otherwise inherently unreliable. In addition, the record indicates that Murzyn was aware of what the government's rebuttal case would be and made the decision to assert his coercion and entrapment defenses in the face of that knowledge. He was not, thus, unprepared to meet the evidence of his prior misconduct. *Cf. United States v. Johnston, supra*, 426 F.2d at 114; *Hansford v. United States, supra*, 303 F.2d at 226. Finally, we think the relevance of the evidence to the entrapment and coercion issue was significant.

and entrapment issues and not to whether Murzyn had stolen the cars or was guilty of the offenses charged because he was a "bad man." *Cf. United States v. Hairrell*, 521 F.2d 1264, 1268 (6th Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 568, 46 L.Ed.2d 409 (1975) (quoted in *United States v. Cunningham*, 529 F.2d 884, 887 (6th Cir. 1976)). Any danger that the jury would convict Murzyn simply because he had been shown to be a "bad man" was, we think, outweighed by the necessity of permitting the government to rebut the issues Murzyn himself had raised. *Cf.* Fed.R.Evid. 404(a)(1). Accordingly, the trial court acted within its discretion in admitting the above–mentioned evidence.[8] As the court said many times during the trial, Murzyn himself "opened the door" to precisely the sort of character evidence that was introduced. After Murzyn opened that door, the court was not required to shut it in the government's face.

■ The remaining evidence of which Murzyn complains was also properly admitted. The testimony by officer Fitch that he used crude racial and sexual slang because Murzyn typically did so and because Fitch had "adopted" Murzyn's terminology to gain his confidence was in direct rebuttal to Murzyn's evidence that Fitch used such slang. The evidence concerning Murzyn's offer to "set up" Stechalski for a beating was, as we have previously noted, introduced by Murzyn himself. Finally, the evidence that Murzyn told Fitch that he had stolen trees, shrubbery, and a cupola tended to show that Murzyn felt comfortable enough with Fitch to confide in him.[9] We find no error in the admission of this evidence.

**8.** Murzyn has also argued on appeal that, even if introduction of the assassination offer he is alleged to have made to Fitch and Ferguson was not error, the introduction of the precise terms of that offer, including alternative methods of compensating Fitch and Ferguson, was error. We agree that the precise terms of the offer were irrelevant to any material issue in the case, but we find their introduction to have been harmless error.

**9.** This evidence was only marginally relevant to any issue in the case; its potential for unfair prejudice was also slight, however. We think

## III.

■ Murzyn's second contention is that the trial court's failure to instruct the jury, *sua sponte*, that the evidence of Murzyn's character was to be considered on the issues of entrapment and coercion and not on the issue of guilt or innocence prejudiced his defense. Murzyn failed to request a limiting instruction either when the evidence of which he complains was admitted or when the case was submitted to the jury. Whether this failure was mere oversight or was a conscious, tactical choice on the part of his defense counsel, it constitutes a waiver of Murzyn's right to a limiting instruction. As the evidence of Murzyn's character was admissible and was not, in context, unfairly prejudicial, the trial court was not obliged, *sua sponte*, to give a limiting instruction. *See United States v. Cooper*, 577 F.2d 1079, 1088–89 (6th Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

## IV.

Murzyn next argues that the trial court failed to comply with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), when it admitted hearsay statements made by an alleged co–conspirator and instructed the jury concerning the weight to be accorded those statements. The statements in question were introduced in the form of taped conversations between officer Fitch and an unidentified male; during the conversations the caller told Fitch that he was a "friend of Mo's," which is Murzyn's nickname, and then told Fitch when and where to take possession of the stolen cars.

the better practice would have been to exclude it, but it was not an abuse of discretion to admit it.

Murzyn has also argued that certain statements that were elicited both by defense counsel and by the prosecution gave the jury the impression that Murzyn was a drug dealer and further prejudiced him in their eyes. The evidence involving drugs was slight, and while the jury probably knew the inference that Murzyn had been involved in the sale of drugs, we think that, under all the circumstances, any error involved in its admission was harmless.

■ Murzyn first contends that the trial court violated the *Santiago* rule when it failed to state a factual basis for its finding, made out of the presence of the jury and by a preponderance of the evidence, that the hearsay statements were made by a co–conspirator as part of a conspiracy in which Murzyn and Hall were participants. *Santiago* does not require that the trial court state on the record the factual basis for its finding. Murzyn next contends that *Santiago* was violated because the trial court did not expressly state that the calls in question were made in the course of and in furtherance of the conspiracy. *Santiago* requires that this finding be made, but it does not require a formalistic statement on the record to that effect. Moreover, as even Murzyn concedes, given the initial finding that a conspiracy existed, it is obvious that the calls were made during the course of and in furtherance of the conspiracy. *Santiago* does not require the trial court to belabor the obvious. The court's findings regarding admission of the hearsay statements were in compliance with *Santiago*.

■ Murzyn also contends, correctly, that the court's cautionary instruction to the jury prior to admission of the hearsay statements, which is reproduced in the margin,[10] should not have been given. *United States v. Santiago, supra*, 582 F.2d at 1132, 1136.[11] Prior to the giving of the instruction, however, Hall's counsel twice requested the court to give a limiting instruction. Murzyn's counsel did not object on either of these occasions; neither did he object when the trial court announced its intention of giving a limiting instruction, when it gave the instruction, or after the instruction had been given. Murzyn has waived his objection to the giving of the instruction.[12]

■ Finally, Murzyn contends that the content of the instruction erroneously stated the law of conspiracy, erroneously conveyed the impression that the court had found Murzyn guilty of conspiracy beyond a reasonable doubt, and unfairly prejudiced the defense. Any error in the instruction was cured by the court's final instructions to the jury, of which no complaint is made. Those instructions told the jury both that a conspirator must be proved to have joined a conspiracy solely by evidence of his own acts and declarations[13] and that the court

---

**10.** The instruction stated:

Ladies and gentlemen of the jury, there is a rule of law that I will instruct you on in the final instructions, and I will give you a somewhat crude thumbnail sketch of it now, because it's relevant to where we are in the trial.

As a general proposition, one person is not bound by statements that other persons make.

You are not bound by statements that other people make, generally.

That is true in the law unless and until it is established independent of those statements that either a joint enterprise or a conspiracy or some type of agreement of that nature has been entered into.

Once it's established beyond a reasonable doubt that an agreement that results or constitutes conspiracy is proven, then statements made by the participants in a conspiracy—if it is proven beyond a reasonable doubt—are binding upon all the participants in it.

Now that is a crude and rather offhand explanation called the "Co–Conspiracy Hearsay Rule," and I'll instruct you on it finally, but I give you that as a preliminary to the evidence that is about to be offered.

**11.** We take this opportunity to reiterate that instructions such as the one quoted in note 10 *supra* should not be given. "[F]or future cases we see neither the need nor desirability of giving the former customary conspiracy instruction limiting the jury's consideration of the declaration of a co–conspirator." *United States v. Santiago, supra*, 582 F.2d at 1136.

**12.** Murzyn contends in his brief that the trial court acknowledged that it was giving the limiting instruction "over the objections of both defendants." We have reviewed the trial transcript and we believe the court meant by that statement that it was admitting the hearsay statements over the defendants' objection, and not that it was giving the limiting instruction over objection. The fact that Hall's counsel twice requested that the instruction be given and the further fact that Murzyn's counsel never voiced objection to it, as well as the context in which the court's remark was made, persuade us that our interpretation is correct.

**13.** The proof of membership must be shown by the alleged co–conspirator's own acts and declarations. *Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). We note that the Committee on Feder-

had not expressed and had not intended to express any opinion on the merits of the case. This was sufficient. *See, e. g., United States v. Allegretti*, 340 F.2d 254, 256 (7th Cir. 1964) (in banc) (adopting the reasoning of *United States v. Allegretti*, 340 F.2d 243, 248–53 (7th Cir. 1964) (Knoch, J., dissenting)), *cert. denied*, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965). Neither did the instruction cause Murzyn any prejudice by virtue of the fact that it may have implied that the jury had a role in determining the admissibility of the hearsay statements. That implication, though inaccurate, *United States v. Santiago, supra*, could only have benefited Murzyn. *See United States v. McPartlin*, 595 F.2d 1321, 1359 n.42 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Accordingly, the instruction caused no prejudice to Murzyn and was not reversible error.

## V.

Murzyn next contends that alleged prosecutorial and judicial misconduct entitled him to a new trial. He first argues that reference by the prosecutor during closing argument to the character evidence discussed in Part II of this opinion, *supra*, was improper. We have held that evidence to have been properly admitted; reference to it during closing argument was, therefore, proper, and we find no other impropriety in the remarks of which Murzyn complains.

■ Murzyn also objects to the prosecutor's statement during closing argument that Murzyn was "a thief who would steal anything from a toothpick to the Eiffel Tower, from a cupola for a chicken coop to shrubbery from a cemetery to 1978 Cadillacs." We do not think the remark went beyond the bounds of argument, especially as it was in part prompted by Murzyn's own testimony at trial that Stechalski "was stealing anything from toothpicks to the Eiffel Tower." In context, we think the jury would have seen in the statement only a hyperbolic assertion that it was Murzyn,

and not Stechalski, who had been proved by the evidence to be guilty of the theft of the cars.

■ Murzyn also contends that the prosecutor's statement to the jury that it should consider "whether or not he [Murzyn] has succeeded in establishing entrapment," was prejudicial because it created the impression that Murzyn had the burden of proving entrapment, when, in fact, the government had the burden of proving the absence of entrapment beyond a reasonable doubt. The statement was not objected to at trial. Any error here was harmless and was cured by the court's final instructions to the jury, which correctly stated the law as to the burden of proof.

Finally, Murzyn cites numerous passages from the record in support of his contention that the trial court unfairly prejudiced the jury by its rulings and remarks during the course of the trial. We have considered the alleged examples of judicial misconduct and have reviewed the trial transcript carefully. The trial judge was at all times fair to Murzyn, allowed him great leeway in presenting his case, and in no sense slanted the proceedings in favor of the government. We need not recite the long list of alleged examples of misconduct because we find, in each instance, that the court acted within its discretion. Murzyn's argument here is without merit.

## VI.

Murzyn next contends that errors made by his trial counsel combined to deny him the effective assistance of counsel guaranteed by the Sixth Amendment. We find that Murzyn was provided with representation that met minimum standards of professional competence as declared in *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir.), *cert. denied*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975).

■ Murzyn first points to the fact that his counsel admitted during the course of the trial that he had not read *Hampton v.*

al Criminal Jury Instructions recently took the same position. *See* Instruction 5.11 (Conspir-

acy) and Committee Comments (approved in principle June 8, 1980).

*United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the most recent Supreme Court pronouncement on the entrapment defense. Murzyn does not indicate a single instance, however, in which it might be claimed that his counsel's failure to read *Hampton* caused him prejudice.[14] We have discovered no prejudice on the record. Thus, while we view the failure to read *Hampton* as serious, we cannot find, in the absence of prejudice, that it amounted to ineffective assistance of counsel.

Murzyn also argues that his counsel failed to object to certain hearsay testimony, other objectionable testimony, and portions of the government's closing argument. He further finds evidence of incompetence in his counsel's failure to request a limiting instruction concerning the prior misconduct evidence, to move for mistrial after certain allegedly prejudicial errors, and to file post–trial motions. Most of these alleged errors are attributable to trial tactics within the range of acceptable professional competence.[15] At many other points in the trial and post–trial proceedings Murzyn's counsel exhibited skilled advocacy on Murzyn's behalf. Under all of the circumstances, we find that Murzyn received competent counsel. *See, e. g., United States v. Fleming*, 594 F.2d 598, 607 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979); *United States ex rel. Spencer v. Warden*, 545 F.2d 21, 23 (7th Cir. 1976); *United States v. Chaussee*, 536 F.2d 637, 642–43 (7th Cir. 1976).

### VII.

■ Murzyn's final allegation of error is that he was unfairly prejudiced by the introduction of evidence of eight acts of intrastate auto theft or attempted auto theft that were charged as overt acts of conspiracy in the indictment. It was not error for the government to allege in the indictment more overt acts than were necessary. *Capriola, v. United States*, 61 F.2d 5, 9 (7th Cir. 1932), *cert. denied*, 287 U.S. 671, 53 S.Ct. 315, 77 L.Ed. 579 (1933). Murzyn cannot argue that the evidence was prejudicial merely because it was cumulative; the government carries a heavy burden in a criminal case and may sustain that burden by proof of more facts than, in retrospect, might appear necessary.

This leaves for consideration only Murzyn's argument that the acts of intrastate auto theft were not overt acts in the charged conspiracy to steal, transport across state lines, and then sell automobiles. We reject this argument also.

■ It is true that the eight instances of auto theft that occurred totally within one state were not federal crimes and were not, therefore, the objects of the conspiracy charged in the indictment. An overt act need not be a completed offense or the ultimate goal of the conspiracy, however. *See Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). The overt act need only be an action taken in furtherance of the conspiracy by one or more of the conspirators. *See* 18 U.S.C. § 371; *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940). We find that the acts of intrastate auto theft and sale were, in the language of

14. Murzyn has argued that, had his counsel read *Hampton*, he would have understood that character evidence would be admissible in rebuttal to prove predisposition. That proposition was obvious long before *Hampton*, however. *E. g., Sorrells v. United States, supra*. Moreover, defense counsel's assertion of the entrapment defense appears to have been the only really viable tactical choice available. It clearly was not, in any event, ineffective assistance of counsel to assert the defense or to assert it in the manner that was chosen.

15. For example, Murzyn's counsel may have failed to request a limiting instruction concerning the prior misconduct evidence and further failed to object to the government's references to that evidence in closing argument out of a desire to downplay that evidence. The failure to object to certain hearsay testimony may have been due to similar concerns. Murzyn's counsel may also have been trying to avoid the appearance of attempting to prevent the jury from hearing the whole truth concerning the coercion issue. We decline the invitation to second–guess trial counsel concerning matters that were merely tactical. *See, e. g., United States ex rel. Rooney v. Housewright*, 568 F.2d 516, 520 (7th Cir. 1977).

§ 371, acts taken "to effect the object of the conspiracy," which was the interstate transportation and sale of stolen vehicles. The intrastate crimes furthered the interstate crimes that were the object of the conspiracy charged in the indictment in at least two ways: First, the intrastate crimes aided in supplying Fitch with a continuous flow of stolen automobiles; they thus facilitated the interstate crimes by satisfying Fitch's demands for stolen cars and thereby maintaining the relationship with Fitch. Second, the intrastate crimes contributed to the overall development and success of Murzyn's car theft ring; they thereby furthered one object of the ring, the interstate theft and sale of automobiles.

In concluding that the intrastate crimes were correctly alleged and proved to be overt acts in a conspiracy to commit the interstate crimes, we acknowledge that it is unlikely that Murzyn or his co–conspirators conceived of the intrastate crimes as mere means to the accomplishment of the interstate crimes. It is also unlikely that they thought they had entered into two agreements: one to violate federal law and another to violate state law. Whether or not the conspirators so conceived the matter, however, the distinction between state and federal crimes requires us to so view the unlawful combination and to make what may appear to be an artificial inquiry into the relationship between the intrastate and the interstate auto thefts. Given the necessary distinction between the state and the federal crimes, we find that the intrastate crimes were intended to further the interstate crimes in the same manner that they were doubtless intended to further what the conspirators perceived to be a simple agreement to steal and sell cars irrespective of whether a state line was crossed in the process.

## VIII.

■ We turn now to defendant Hall's two allegations of error. Hall argues, first, that the trial court's failure to grant his motion for severance prior to trial and its subsequent failure to order a severance *sua*

*sponte* was prejudicial error. Hall maintains that the evidence admitted against Murzyn prejudiced the jury against Hall. Under settled standards, *see, e. g., United States v. McPartlin*, 595 F.2d 1321, 1332–33 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979), Hall was not prejudiced by the joint trial and was not entitled to severance. We reach this conclusion because Hall's defense at trial was that of mistaken identity. Murzyn's defense, as has been stated, was that of entrapment and coercion. The defenses were not antagonistic, and the jury could have totally believed the government's case against Murzyn and still totally believed Hall's defense. The only issue for the jury to resolve as to Hall was whether he was the person the government agents testified they had seen delivering the cars to Fitch. The jury resolved that issue against Hall. There is no indication that they did so because of anything in the government's case against Murzyn. *See United States v. McPartlin, supra*, 595 F.2d at 1333–34.

■ Hall's second contention is that the trial judge unfairly prejudiced Hall's defense when he said during trial: "The fact of the matter is they haven't invented a camera yet that is as good as the human eye, have they? As a general proposition." The statement was made immediately following Hall's counsel's efforts to break down testimony by a police officer to the effect that, while on surveillance duty at night, his view of a car thief that was alleged to have been Hall was better than the image of the thief in a photograph the officer had taken at the time.

In the interest of caution it might have been better had the court not made the statement of which Hall complains. Even if we were to view the statement as error, however, Hall suffered no prejudice as a result of it. The court, in its final instructions, told the jury to "disregard any statement made during the course of the trial by . . . the Court which is not supported by the evidence." He further instructed them to disregard anything he may have said or done during the trial "that some of you

might interpret as my views on the weight of the evidence or the credibility of the witnesses" and told them he had "not intended to express any opinion" as to the credibility of witnesses or the merits of the case. This was sufficient to cure any error that might be found in the remarks at issue.

The judgments of conviction are affirmed.

AFFIRMED.